Paul E. WEBER, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 23, 2011.

Supreme Court of Delaware.

Submitted: Dec. 14, 2011.

Decided: Feb. 21, 2012.

Leo John Rammuno, Wilmington, Delaware, for appellant.

James T. Wakley (argued) and Morgan T. Zurn, Department of Justice, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, BERGER, and JACOBS, Justices.

STEELE, Chief Justice:

On remand, the State retried Paul Weber for Attempted Robbery First Degree and the jury convicted him. The trial judge sentenced Weber to 25 years at level V. Weber appeals his conviction and sentence, arguing the following: (1) the trial judge erroneously denied him a missing evidence instruction; (2) Sergeant Hawk's out of court identification procedure was impermissibly suggestive and unreliable; (3) the trial judge abused his discretion by asking the prospective jury panel two *voir dire* questions pertaining to mental illnesses and illicit drug use; (4) the manner in which the trial judge conducted his colloquy violated Weber's constitutional right to a fair trial; (5) there was insufficient evidence to support the conviction; (6) the trial judge erred by not, *sua sponte*, expounding upon the wording of the statute or providing a single-theory unanimity instruction; (7) the State committed prosecutorial misconduct; (8) Weber's conviction and sentencing for both Attempted Carjacking and Attempted Robbery First Degree constituted prohibited cumulative punishment in violation of constitutional protections against double jeopardy; and (9) the trial judge made an erroneous finding of fact by concluding that Weber had rejected the State's modified plea agreement. We find that the issues Weber raise have no merit. We therefore affirm.

## I. Factual and Procedural Background

On August 18, 2004, at approximately 10:00 p.m., 74 year old Frederick Naspo stopped to refuel his car at the Shell gas station on the corner of Kirkwood Highway and Duncan Road, in New Castle County. As Naspo got out to pump gas, a man with a cigarette behind his ear approached him at the pump. Naspo said, "Good evening," and asked the man whether he intended to smoke near the gas pump. According to Naspo, the man replied, "No, I'm going to take your car." With both hands, the man grabbed for Naspo's car keys, twice telling Naspo that he had a gun. Failing to get the car keys, the man ran away. Naspo had the gas station attendant call the police.

At 10:13 p.m., Delaware State Police Sergeant Mark Hawk responded to the Shell gas station and met with Naspo. Naspo told Hawk that his assailant was a white male, about 35 years old and approximately five feet eight inches tall, 160 pounds, wearing jeans and a loose fitting blue shirt.[1] While speaking with Naspo, Hawk learned that police had a suspect detained in the parking lot of a nearby Sleepy's mattress store, about a block and a half away. The suspect appeared to match Naspo's description of his assailant.

Hawk drove Naspo to the Sleepy's parking lot for a showup identification of the detained suspect, who was Paul Weber, a man whom Hawk had encountered several times before, dating back to 1984. Naspo viewed Weber from the backseat of Hawk's patrol vehicle. To Naspo, it appeared that Weber wore military fatigues; however, at trial Hawk testified that Weber had worn blue jeans and an oversized blue shirt. Unconvinced that Weber was his assailant, Naspo told police that Weber

1. Op. Br. app. at A46, A51.

was not the man that assaulted him. Police released Weber and drove him home.

That same night, Hawk interviewed the Shell gas station attendant and learned that the gas station had a video surveillance system. Because the attendant did not have access to the surveillance system, Hawk would have to return in the morning to view the tapes. On August 19, 2004, at around 10:00 a.m., Hawk returned to the gas station and viewed the video surveillance tape. Upon reviewing the footage, Hawk recognized that Naspo's assailant was Paul Weber. Hawk testified that the man in the video had the same facial features as Weber, and wore the same clothing Weber had worn when he was detained in the Sleepy's parking lot: an oversized blue shirt and blue jeans.

Hawk went to Weber's residence with an arrest warrant and arrested Weber in his bedroom. At the time, Weber wore nothing but his underwear, so Hawk grabbed a pair of blue jeans and a blue shirt from the floor of Weber's bedroom. The police transported Weber to Troop 2 for booking and processing.

A grand jury indicted Paul Weber on September 20, 2004, on charges of Attempted Robbery First Degree and Attempted Carjacking First Degree. In March 2005, following a trial, a jury convicted Weber of both charges. As a result, the trial judge sentenced Weber to 25 years at level V for Attempted Robbery First Degree, and three years at level V for Attempted Carjacking First Degree. Weber appealed his convictions and sentences.

On appeal, we affirmed Weber's conviction for Attempted Carjacking First Degree. We reversed Weber's conviction for

Attempted Robbery First Degree and remanded for a new trial, however, on the basis that the trial judge erroneously denied Weber an instruction on the lesser included offense of Offensive Touching.[2]

The State retried Weber for Attempted Robbery First Degree in April 2010. The jury convicted him. Weber filed a post trial motion for judgment of acquittal, which the trial judge denied. In July 2010, the State moved to declare Weber a habitual offender for sentencing purposes. The trial judge granted that motion following a December 17, 2010 habitual offender hearing. In October 2010, Weber moved to enforce a plea bargain the State had previously offered. The trial judge denied Weber's motion in a memorandum opinion stating that Weber had rejected the State's plea bargain and instead had chosen to go to trial. Weber also moved to have his sentences merged. The trial judge denied that motion as well.

The trial judge later sentenced Weber to 25 years at level V for Attempted Robbery First Degree. Weber now appeals his conviction and sentence.

## III. Discussion

### A. Police had no duty to preserve Weber's shirt.

■ Weber argues that he was entitled to a missing evidence instruction at trial because police failed to gather and preserve the shirt he wore at the time of his arrest. We review a denial of requested jury instructions de novo.[3]

■ As we held in *Lolly v. State*, the State has a duty, *ab initio*, to gather and preserve evidence that may be material to

---

**2.** *Weber v. State (Weber I)*, 971 A.2d 135, 142–43 (Del.2009).

**3.** *Lunnon v. State*, 710 A.2d 197, 199 (Del. 1998) (quoting *Deberry v. State*, 457 A.2d 744, 750 (1983)).

a defendant's guilt or innocence.[4] Failure to do so may require a missing evidence instruction commonly known as a *Lolly* or *Deberry* instruction.[5] When reviewing a claim that a judge improperly denied a request for a missing evidence instruction, we consider:

> (1) [whether] the requested material, if extant in the possession of the State at the time of the defense request, [would] have been subject to disclosure under Criminal Rule 16 or Brady[;] (2) [and] if so, [whether] the government [had] a duty to preserve the material[; and] (3) [whether the State breached that duty and to what extent the] consequences should flow from the breach? [6]

■ We recognize that Weber's shirt would have been subject to disclosure under Criminal Rule 16.[7] In this case, however, the State had no duty to preserve the shirt. Hawk testified that at the time of his arrest, Weber had nothing on but his underwear. Hawk further testified that he grabbed the nearest clothing in Weber's room for Weber to put on before taking him to Troop 2. Hawk grabbed a blue shirt and a pair of blue jeans from the floor of Weber's bedroom.[8] It was only for convenience's sake that Hawk grabbed the nearest clothing available, which happened to be a blue shirt and blue jeans. Other than the fact that the shirt was blue, the police had no reason to believe that the shirt Weber wore when arrested was the same shirt worn by the perpetrator depicted in the video surveillance footage.

Furthermore, Detective James Spillion testified, that the blue shirt in the surveillance footage displayed no identifying characteristics.[9] Had it been the case that the shirt in the video and the shirt Hawk grabbed for Weber were in fact the same, that could not reasonably be interpreted as potentially exculpatory, because it would only serve to cement Weber's connection to the offense.

Absent any basis for the police to believe the shirt exculpated Weber, we fail to see what duty the police had to preserve the shirt. We therefore find that the trial judge properly denied Weber's request for a missing evidence instruction.

■■ Even if we were to assume, *arguendo*, that a duty existed and that the State negligently[10] breached it by failing to preserve the shirt, Weber was still not entitled to a missing evidence instruction because he suffered no prejudice. There are three factors we consider to determine the consequences that should flow from a breached duty to preserve evidence: (1) "the degree of negligence or bad faith involved;" (2) "the importance of the missing evidence and the reliability of the secondary or substitute evidence that remains available;" and (3) "the sufficiency of the State's other evidence" to support the con-

4. 611 A.2d 956, 960 (Del.1992).

5. *Lunnon*, 710 A.2d at 199 & n. 6. A *Lolly* instruction tells the jury to infer that "the missing evidence, had it been collected/preserved, would not have incriminated the defendant and would have tended to prove the defendant not guilty." *Lolly*, 611 A.2d at 962 n. 6.

6. *Id.*

7. Weber's shirt would have been subject to disclosure under Superior Court Criminal Rule 16(a)(1)(c) as a tangible object "obtained from or belong[ing] to the defendant."

8. Op. Br. app. at A61–62.

9. *Id.* at A81.

10. Weber does not allege that the State acted in bad faith. We must infer that Weber implies the State acted negligently. *See Lunnon*, 710 A.2d at 200.

viction.[11]

Weber contends that if the missing shirt was anything other than blue, then he could argue that he was not the man depicted in the video surveillance footage. Despite the obvious flaws in that reasoning, there was reliable secondary evidence about the missing shirt available to Weber. First, two witnesses testified about the apparent color of Weber's shirt: Hawk, who arrested Weber, and Spillion, who was present during Weber's booking and processing.[12] Both had seen the shirt and testified about its color. Weber had the opportunity to cross examine both officers, and he did. Second, the State introduced photos showing the shirt's color. The State proffered arrest photographs of Weber, which depicted the shirt Weber wore during his arrest. The jury could see the color for themselves, which enabled Weber to argue that the color of the shirt in the arrest photograph was not blue.

Finally, even without producing the shirt, the remaining evidence was sufficient to support Weber's conviction. The State presented video surveillance footage of the incident together with testimony from Hawk identifying Weber as the assailant depicted in the footage. Weber also generally fit the physical description given by Naspo, and the police found Weber in close proximity to the crime scene. Whatever possible exculpatory value the missing shirt may have had for Weber, was clearly outweighed by the availability of reliable secondary evidence and the sufficiency of the remaining evidence to support his conviction.[13]

Although the State has a duty to gather and preserve potentially exculpatory evidence, in this case there was no basis for requiring the police to preserve Weber's shirt and the trial judge properly denied Weber's request for a missing evidence instruction.

**B. The circumstances of Hawk's out of court identification of Weber as the man in the surveillance video were neither impermissibly suggestive nor unreliable.**

■ At trial, Hawk testified that Weber was the assailant depicted in the gas station surveillance footage. Weber claims that the circumstances surrounding Hawk's out of court identification violated his due process rights because they were suggestive and made the identification unreliable. Weber made no objection to Hawk's testimony at trial on any ground of impermissibly suggestive identification procedure. We therefore review for plain error.[14]

■ An impermissibly suggestive identification procedure in and of itself does not require the exclusion of evidence.[15] As the United States Supreme Court observed in *Neil v. Biggers,* "It is the likelihood of misidentification which violates a defendant's right to due process." [16] The ulti-

---

11. *Johnson v. State,* 27 A.3d 541, 547–48 (Del. 2011) (internal citations omitted).

12. Op. Br. app. at A75.

13. *See Lunnon,* 710 A.2d at 200 ("[W]e find that the possible value of any exculpatory fingerprints to Lunnon is outweighed by the lack of police negligence and minimized by the other substantial evidence supporting his conviction.").

14. Supr. Ct. R. 8.

15. *Harris v. State,* 350 A.2d 768, 771 (Del. 1975).

16. 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

mate question is whether or not the identification of the defendant was reliable.[17]

■ Whether or not the circumstances are impermissibly suggestive is a fact-specific inquiry.[18] The typical case of suggestive identification involves a suggestion by police impressed upon a witness or victim to identify a suspect.[19] In this case, Weber's challenge is not that police impermissibly suggested to Naspo that Weber assaulted him. In fact, Naspo told police he did not think Weber was the right man. Instead, Weber challenges the circumstances by which a police officer came to independently identify Weber as the man depicted in the gas station surveillance footage. Presumably, Weber argues that because Hawk knew Weber had been detained at a nearby gas station, he was conditioned (i.e., suggested) to see Weber in the gas station's surveillance footage.

■ Weber's theory of suggestion is unavailing on the facts of this case, for two reasons. First, Hawk encountered Weber not as a victim of crime but in Hawk's professional capacity as a police officer, with an open observant mind steeled against suggestion by training and experience. Second, independent of this investigation, Hawk had a 20 year base of familiarity with Weber's physical characteristics from which he could draw when assessing the surveillance footage.[20] In short, the distorting risk of suggestion on Hawk in this case is negligible.

■ Finally, Hawk's identification of Weber was not unreliable. We look at the totality of the circumstances and consider the following factors, in assessing the reliability of an out of court identification:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[21]

Reviewing the instant facts, we note that the Sleepy's parking lot was well lit and Hawk had ample opportunity to observe Weber's physical characteristics shortly after the crime.[22] Hawk reviewed the surveillance video and made his identification less than twenty-four hours after observing Weber in the parking lot. As noted above, Hawk also had familiarity with Weber's appearance before making the out of court identification. Hawk testified that he had met Weber several times before the current incident, dating back to 1984. Moreover, at trial, the jury had as evidence Weber's arrest photo and the surveillance footage, and could weigh the accuracy and reliability of Hawk's identification testimony for themselves. Taken together, these factors indicate that Hawk's identification of Weber was not unreliable.

17. *See id.*

18. *See Richardson v. State,* 673 A.2d 144, 147 (Del.1996).

19. *E.g., Biggers,* 409 U.S. at 195, 93 S.Ct. 375 (challenging victim identification of defendant resulting from showup conducted by police).

20. *See Vouras,* 452 A.2d at 1168–69 (holding identification not unnecessarily suggestive where officer had personal familiarity of defendant's voice independent from the current investigation); *Winn v. State,* 1993 WL 144875, at *3 (Del. Apr. 21, 1993) (ORDER) (holding identification not unnecessarily suggestive where probation office had extensive familiarity with defendant's physical characteristics independent of current investigation).

21. *Vouras v. State,* 452 A.2d 1165, 1167–68 (Del.1982) (quoting *Biggers,* 409 U.S. at 199, 93 S.Ct. 375).

22. Op. Br. app. at A59–61.

Because the identification was neither impermissibly suggestive nor unreliable, Hawk's testimony identifying Weber was properly admitted.

### C. Weber's remaining assignments of error are without merit.

Weber also raises the following issues on appeal: (1) whether the trial judge abused his discretion by asking the prospective jury panel two *voir dire* questions pertaining to mental illnesses and illicit drug use; (2) whether the manner by which the trial judge conducted his colloquy with Weber violated Weber's constitutional right to a fair trial; (3) whether there was sufficient evidence to support the conviction; (4) whether the trial judge erred by not, *sua sponte*, expounding upon the wording of the statute, and also by not providing a single-theory unanimity instruction; (5) whether the State committed prosecutorial misconduct, violating Weber's due process rights; (6) whether convictions and sentencing for both Attempted Carjacking and Attempted Robbery First Degree constituted prohibited cumulative punishment in violation of double jeopardy; and (7) whether the trial judge made an erroneous finding of fact when concluding that Weber had rejected the State's modified plea agreement.

Having carefully considered the decision and judgment of the Superior Court dated January 14, 2011, together with the briefs filed by the parties, the Court has determined the following: To the extent that the issues raised on appeal are factual, the record evidence supports the trial judge's factual findings; to the extent that the issues raised are attributed to an abuse of discretion, the record does not support those assertions; and, to the extent the issues raised are legal, they are controlled by settled Delaware law, which was properly applied.

### III. Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed.