IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GABRIEL F. PARDO, | § | |
| | § | No. 68, 2016 |
| Defendant Below- | § | |
| Appellant, | § | |
| | § | Court Below: |
| v. | § | Superior Court of the |
| | § | State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | Cr. Id. No. 1409011585 |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: February 22, 2017
Decided: April 26, 2017

Before **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Julianne E. Murray, Esquire (*argued*), MurrayPhillips, P.A., Georgetown, Delaware for Appellant.

Sean P. Lugg, Esquire, and Andrew J. Vella, Esquire (*argued*), Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

# I.     INTRODUCTION

On October 2, 2015, Appellant Gabriel F. Pardo ("Pardo") was convicted of Manslaughter, Leaving the Scene of a Collision Resulting in Death ("LSCRD"), Reckless Driving, and six counts of Endangering the Welfare of a Child. The charges arose from his involvement in a fatal hit-and-run collision with a bicyclist, Phillip Bishop ("Bishop"), on September 12, 2014 at approximately 8:30 p.m. on Brackenville Road in Hockessin. The principal issue raised in this appeal is whether Pardo's conviction for LSCRD violated his Due Process rights, as he contends that the LSCRD statute imposes strict liability. Pardo also contends that the Superior Court erred by adding a voluntary intoxication instruction to the pattern jury instruction for manslaughter, by denying his motion for judgment of acquittal, and by denying his request for a missing evidence instruction.

We conclude that the statute governing LSCRD, 21 *Del. C.* § 4202, does not impose strict liability because it requires the State to prove beyond a reasonable doubt that a defendant had knowledge that he or she was involved in a collision. Because we find Pardo's other arguments without merit, we AFFIRM his conviction and sentence.

# II.     RELEVANT FACTS AND PROCEDURAL BACKGROUND

Pardo received a three-year sentence for his conviction for LSCRD under 21 *Del. C.* § 4202 ("Section 4202"). Section 4202 provides, in relevant part:

> (a) The driver of any vehicle involved in a[] collision resulting in injury or death to any person shall immediately stop such vehicle at the scene of such collision. Said stop should be made as close to the scene of the collision as possible without obstructing traffic more than necessary. The driver shall give the driver's name, address and the registration number of the driver's

1

vehicle and exhibit a driver's license or other documentation of driving privileges to the person struck or the driver or occupants of any vehicle collided with and shall render to any person injured in such collision reasonable assistance, including the carrying of such person to a hospital or physician or surgeon for medical or surgical treatment if it is apparent that such treatment is necessary or is requested by the injured person, or by contacting appropriate law-enforcement or emergency personnel and awaiting their arrival.

(b) Whoever violates subsection (a) of this section when that person has been involved in a collision resulting in injury to any person shall be guilty of an unclassified misdemeanor, be fined not less than $1,000 nor more than $3,000 or imprisoned not less than 1 year nor more than 2 years.

(c) *Whoever violates subsection (a) of this section when that person has been involved in a collision resulting in death to any person shall be guilty of a class E felony. The provisions of § 4206(a) or § 4217 of Title 11 or any other statute to the contrary notwithstanding, the sentence for such offense shall include a period of incarceration of not less than 1 year and the first 6 months of any sentence imposed shall not be suspended.*[1]

Pardo argued to the trial court that Section 4202 unconstitutionally imposes a felony conviction and a minimum mandatory period of imprisonment without requiring the State to prove the defendant's mental culpability. The Superior Court disagreed, concluding that Section 4202 constitutionally imposes strict liability.[2] The Superior Court held, in the alternative, that the statute is constitutional as applied to Pardo, reasoning that Pardo "*knew* he was in a collision" and "*knowingly* and *intentionally* left

---

[1] 21 *Del. C.* § 4202 (emphasis added). We have observed that Section 4202 "deals with the category of collisions that might be thought to be the most important: those involving injuries or death to human beings and not merely property damage." *Zhurbin v. State*, 104 A.3d 108, 112-13 (Del. 2014).

[2] *State v. Pardo*, 2015 WL 6945310, at *1-2 (Del. Super. Ct. Nov. 9, 2015).

2

the scene of the collision without first determining whether anyone was injured or killed."[3]

On appeal, Pardo contends that Section 4202, as a strict liability statute, is unconstitutional under a test set forth in *Morissette v. United States* because conviction results in a relatively large penalty and "gravely besmirche[s]" one's reputation.[4] We observe at the outset that this Court has not addressed the constitutionality of Section 4202 directly, and the issue of the mental state required, if any, is one of first impression.

Both Pardo and the State suggest that our analysis in *Hoover v. State*,[5] which involved another provision of the Motor Vehicle Code, should guide our resolution of the issues involving the mental state required in Section 4202. In *Hoover*, we considered two certified questions of law, namely, (1) whether the "general liability provisions" of 11 *Del. C.* § 251(b) applied to 21 *Del. C.* § 4176A, which penalizes the operation of a motor vehicle causing death ("Section 4176A"), and (2) whether Section 4176A was unconstitutionally vague. Section 4176A provided in part:

---

[3] *Id.* at *2 (emphasis in original).

[4] *See Morissette v. United States*, 342 U.S. 246, 255-56 (1952) (sanctioning the imposition of criminal liability in the absence of *mens rea* in a limited category of "public welfare offenses" with the understanding that "penalties commonly are relatively small, and conviction does not [do] grave damage to an offender's reputation"). Following the United States Supreme Court's *Morissette* decision, the United States Court of Appeals for the Eighth Circuit concluded that the elimination of a *mens rea* requirement did not violate Due Process where, among other requirements, "the penalty is relatively small" and the "conviction does not gravely besmirch[.]" *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960) (citations omitted). Extrapolating from the language in *Holdridge*, the United States Court of Appeals for the Sixth Circuit articulated the frequently quoted two-part test, specifically stating that "[t]he elimination of the element of criminal intent does not violate the due process clause where (1) the penalty is relatively small, and (2) where conviction does not gravely besmirch." *United States v. Wulff*, 758 F.2d 1121, 1125 (6th Cir. 1985).

[5] 958 A.2d 816 (Del. 2008).

(a) A person is guilty of operation of a vehicle causing death when, in the course of driving or operating a motor vehicle or OHV in violation of any provision of this chapter other than § 4177 of this title, the person's driving or operation of the vehicle or OHV causes the death of another person.[6]

This Court found that the plain language of Section 4176A reflected the General Assembly's unambiguous intention not to provide a requisite mental state for committing that offense. We observed that Section 4176A is an unclassified misdemeanor in the motor vehicle code and simply requires an underlying violation of the motor vehicle code. We concluded that the General Assembly's intent was to create an offense premised on a lower level of culpability than that required for vehicular homicide (requiring criminally negligent driving or operation of a motor vehicle), criminally negligent homicide (requiring criminal negligence), and manslaughter (requiring recklessness).[7] Applying Section 251(b) would have defeated the legislative purpose of establishing a lower level of culpability. Accordingly, in applying 11 *Del. C.* § 251(c) (concerning strict liability offenses), we concluded that "the General Assembly's intent to impose strict liability for deaths proximately caused by a moving violation of the Motor Vehicle Code 'plainly appears' in both the unambiguous language of the statute and its legislative history."[8]

---

[6] *Id.* at 818 (quoting 21 *Del. C.* § 4176A).

[7] *Id.* at 820 (citing 11 *Del. C.* §§ 630(a)(1), 631, 632(1)); *see, e.g.*, *State v. Avila-Medina*, 2009 WL 2581874, at *1 (Del. Super. Ct. Mar. 5, 2009) (observing that Section 4176A "was meant to 'fill the gap between normal motor vehicle violations which [do not] result in any harm to people and the vehicular crimes which are in our criminal code like vehicular homicide, manslaughter or criminally negligent homicide.'" (alteration in original) (quoting Senate Debate, Del. H.B. 190, 142d Gen. Assem. (2003))).

[8] *Hoover*, 958 A.2d at 820.

4

In considering the second certified question as to whether Section 4176A was unconstitutionally vague for failing to specify the state of mind required to find an actor guilty, citing *Morissette*,[9] we held that, because Section 4176A "is part of the state's motor vehicle code, it falls within the class of statutes that relate to the public safety and welfare and need not require a specific state of mind."[10] However, because the question was not before us, we expressly did not address whether the penalty provisions of Section 4176A (an unclassified misdemeanor) were unconstitutionally excessive as a strict liability offense.[11] Pardo now contends on appeal that, like Section 4176A, Section 4202 is a strict liability statute, but that this Court has not yet addressed the constitutionality of a strict liability crime that results in a *felony* conviction with minimum mandatory imprisonment.[12]

---

[9] 342 U.S. 246 (1952).

[10] *Hoover*, 958 A.2d at 822 (citing *Morissette*, 342 U.S. at 256-60).

[11] Violation of Section 4176A constituted an unclassified misdemeanor resulting in a fine of up to $1,150 or a maximum of thirty months' incarceration. *Id.* at 818 n.5 (citing 21 *Del. C.* § 4176A(b)-(c)). We "offer[ed] no opinion on whether a sentence of thirty months in prison is a 'relatively small' penalty that would not violate the due process rights of a person who lacked intent to commit a crime, under *Morissette*." *Id.* at 824 (citing *Morissette*, 342 U.S. at 256). However, this Court noted in *dictum* that eleven other states with analogous statutes imposed maximum prison terms of six months to five years. *Id.* Later, the Superior Court considered the question and declined to find the penalty provision in Section 4176A unconstitutionally excessive. *See Avila-Medina*, 2009 WL 2581874, at *4.

[12] Due to the consequences resulting from a felony conviction, including, for example, loss of the right to vote, the right to sit on a jury, the right to possess a gun, and the possibility of being barred from entering certain professions, many courts have concluded that a felony conviction irreparably damages one's reputation. *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 618 (1994) ("After all, 'felony' is, as we noted in distinguishing certain common-law crimes from public welfare offenses, 'as bad a word as you can give to man or thing.'" (quoting *Morissette*, 342 U.S. at 260)). *But cf. United States v. Engler*, 806 F.2d 425, 434 n.4 (3d Cir. 1986) (criticizing decisions that "appear to have established a bright-line rule" that felony convictions "will always violate due process if liability is not predicated on scienter" (citing *Wulff*, 758 F.2d

In response, the State argues that Section 4202 is not a strict liability statute because it applies only where a defendant has knowledge that a collision occurred. At oral argument, Pardo argued that if the State is correct that Section 4202 does require knowledge, then, in addition to proving that the defendant knew that a collision occurred, the State must also prove the defendant's knowledge that the collision resulted in personal injury or death.

## III.    DISCUSSION

### A.    *Scope and Standard of Review*

"Subject to State and Federal Constitutional limitations, 'the creation and definition of crimes under Delaware law is a matter for legislative enactment either through the Criminal Code or by another law.'"[13]  "We review claims challenging the constitutionality of a statute *de novo*[.]"[14]  When exercising this review, "there is a strong presumption that a legislative enactment is constitutional."[15]  Accordingly, "[w]e resolve all doubts in favor of the challenged legislative act."[16]  In addition, "we review legal

---

at 1125; *United States v. St. Pierre*, 578 F.Supp. 1424, 1429 (D.S.D. 1983))).

[13] *Eaton v. State*, 703 A.2d 637, 640 (Del. 1997) (quoting *Taylor v. State*, 679 A.2d 449, 454 (Del. 1996)); *see* 11 *Del. C.* § 202(a) ("No conduct constitutes a criminal offense unless it is made a criminal offense by this Criminal Code or by another law.").

[14] *Steckel v. State*, 882 A.2d 168, 170 (Del. 2005) (citing *Thomas v. State*, 725 A.2d 424, 427 (Del. 1999)).

[15] *Lamberty v. State*, 108 A.3d 1225, 2015 WL 428581, at *1 (Del. Jan. 30, 2015) (TABLE) (quoting *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258 (Del. 2011)); *see also Opinion of the Justices*, 425 A.2d 604, 606 (Del. 1981) ("Legislative acts should not be disturbed except in clear cases, and then only upon weighty considerations; a legislative enactment is cloaked with a presumption of constitutionality and should not be declared invalid unless its invalidity is beyond doubt." (citing *Justice v. Gatchell*, 325 A.2d 97, 102 (Del. 1974))).

[16] *Lamberty*, 2015 WL 428581, at *1 (quoting *Sheehan*, 15 A.3d at 1258).

6

rulings, including the interpretation of statutes, *de novo*."[17] "Where a statute contains unambiguous language that clearly reflects the intent of the legislature, then the language of the statute controls."[18] We "read each [relevant] section [of the statute] in light of all of the others to produce a harmonious whole.'"[19]

## B. *Section 4202 Does Not Impose Strict Liability*

We affirm the Superior Court's conviction and sentence on its alternate ground that Section 4202 is not a strict liability statute. In this case, the absence of express language specifying a mental state, such as knowledge, does not mandate a conclusion that none is required and that the offense is a strict liability offense.[20] Rather, determining the mental state required requires construction of the statute and inference of the General Assembly's intent.[21] The plain language of the relevant statutory provisions is our starting point.

---

[17] *Zhurbin*, 104 A.3d at 110 (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1040 (Del. 2011)).

[18] *Id.* (quoting *Hoover*, 958 A.2d at 820).

[19] *Id.* (alteration in original) (quoting *Progressive N. Ins. Co. v. Mohr*, 47 A.3d 492, 496 (Del. 2012)).

[20] *See Staples*, 511 U.S. at 605 (observing that legislative silence with respect to the required mental state "by itself does not necessarily suggest that [the legislature] intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal." (citing *United States v. Balint*, 258 U.S. 250, 251-52 (1922)). We observe that "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis v. United States*, 341 U.S. 494, 500 (1951) (italics added).

[21] *See Staples*, 511 U.S. at 605 ("[W]e have long recognized that determining the mental state required for commission of a federal crime requires 'construction of the statute and . . . inference of the intent of Congress.'" (omission in original) (quoting *Balint*, 258 U.S. at 253) (additional citation omitted)).

7

In determining whether the General Assembly intended to impose strict liability for LSCRD, we look first to Section 251 of Title 11, which addresses the proof of state of mind required unless otherwise provided, as well as strict liability. Section 251 provides:

> (a) No person may be found guilty of a criminal offense without proof that the person had the state of mind required by the law defining the offense or by subsection (b) of this section.
>
> (b) When the state of mind sufficient to establish an element of an offense is not prescribed by law, that element is established if a person acts intentionally, knowingly or recklessly.
>
> (c) It is unnecessary to prove the defendant's state of mind with regard to:
>
> > (1) Offenses which constitute violations, unless a particular state of mind is included within the definition of the offenses; or
> >
> > (2) Offenses *defined by statutes other than this Criminal Code*, *insofar as a legislative purpose* to impose strict liability for such offenses or with respect to any material element thereof *plainly appears*.
>
> In all cases covered by this subsection, it is nevertheless necessary to prove that the act or omission on which liability is based was voluntary as provided in §§ 242 and 243 of this title.[22]

Section 251(c) makes clear that, in order for Section 4202 to impose strict liability, the General Assembly's intent to impose strict liability for a violation of Section 4202 resulting in death must "plainly appear." Otherwise, Section 251(b) instructs that the state of mind applicable to violation of Section 4202 would be intent, knowledge, or recklessness.[23]

---

[22] 11 *Del. C.* § 251 (emphasis added).

[23] *See id.* § 251(b).

The State contends that, unlike Section 4176A construed in *Hoover*, Section 4202 is not a strict liability statute and, thus, the *Morissette* test does not apply. We agree and think that when the General Assembly makes an offense a felony, it cannot be said that "a legislative purpose to impose strict liability . . . *plainly appears*."[24] Instead, we conclude that a plain reading of the relevant statutory provisions reveals the General Assembly's intent to require the State to prove that the defendant knew he was involved in a collision and left the scene without fulfilling the statutory duties imposed in Section 4202.

In reaching this conclusion, we observe that Section 4202 must be read in the context of the series of duties imposed in Chapter 42 of Title 21.[25] Read *in pari materia*,[26] Sections 4201 and 4202 impose upon drivers involved in collisions the duty to assess the nature and consequences of a collision before continuing on with their journey. Section 4201 provides, in relevant part:

---

[24] *See id.* § 251(c) (emphasis added); *see also Staples*, 511 U.S. at 616 (observing that, "[h]istorically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*" and that "the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary").

[25] *See Zhurbin*, 104 A.3d at 111 (reading Section 4201 in conjunction with "Chapter 42 more generally" to conclude that Section 4201 imposes duties on the driver of "*any* vehicle" involved in a collision, "not only one on a public highway" (emphasis in original) (footnote omitted)).

[26] The legislative debate during which the General Assembly considered whether to elevate LSCRD from a misdemeanor to a felony also suggests that Sections 4201 and 4202 are intended to be read together. The testifying Deputy Attorney General explained:

> When you read Section[s] 4201 and 4202 together, what they instruct drivers in Delaware is, if you are involved in an accident, you have to stop and ascertain whether or not an injury has occurred. Then if an injury has occurred, there are certain things you are supposed to do.

Senate Debate on S.B. 154 at 6:25 (enacted as 73 Del. Laws ch. 163 (2001)), *available at* Ex. A to Answering Br.

(a)  The driver of any vehicle involved in a collision resulting in *apparent damage* to property shall immediately stop such vehicle at the scene of the collision.  Said stop should be made as close to the scene of the collision as possible without obstructing traffic more than necessary.  The driver shall immediately undertake reasonable efforts to ascertain whether any person involved in the collision was injured or killed.  If such collision resulted in injury or death, the driver shall comply with § 4203 of this title.  If, after reasonably ascertaining that there are no injuries or deaths, and if the damaged vehicle is obstructing traffic, the driver of the vehicle must make every reasonable effort to move the vehicle or have it moved so as not to obstruct the regular flow of traffic more than necessary.  If the damage resulting from such collision is to the property of the driver only, with no damage to the person, property of another, or the environment, the driver need not stay at the scene of the collision but shall immediately make a report of the damage resulting as required by § 4203 of this title.[27]

The word "apparent" implies knowledge, as its common dictionary meaning is "visible," "manifest," or "obvious."[28]  Section 4202 provides that drivers must stop and render reasonable assistance to persons who have been injured.[29]  Once Sections 4201 and 4202 have been complied with, Section 4203 requires a driver to report to the police any collision resulting in injury, death, or property damage "to an apparent extent of $500 or

---

[27] 21 *Del. C.* § 4201(a) (emphasis added).  The Court of Common Pleas has determined that a person is "involved" in a collision if he or she is "connected with an accident in a natural or logical manner or implicated or entangled with the final event."  *State v. McDonnell*, 2006 WL 759703, at *4 (Del. Com. Pl. Mar. 23, 2006).

[28] *Apparent*, *Black's Law Dictionary* (10th ed. 2014); *see also Webster's Third New Int'l Dictionary of the English Language* 102 (2002) (defining "apparent" as "capable of easy perception . . . readily perceptible to the senses . . . open to ready observation or full view . . . unobstructed and unconcealed"); *see also Stevenson v. State*, 8 A.2d 914, 916 (Del. Super. Ct. 1939) (Terry, J.) (interpreting the General Assembly's addition in 1935 of the word "apparent" to an earlier version of the statute and concluding that "the Legislature intended by its amendment, in inserting the word 'apparent' after the word 'in' and before the word 'damage,' to qualify the duty of the driver aforesaid, wherein and whereby he would only be liable in the event the damage was apparent in the sense of being 'open to view'; 'capable of being easily understood'; 'evident'; 'seeming', rather than true or real; 'capable of being seen'; 'easily seen'; 'visible to the eye'; 'within sight or view'; 'manifest'; 'obvious'; 'what appears or has been made manifest'").

[29] 21 *Del. C.* § 4202(a).

more" or that "appears" to involve "a driver whose physical ability is impaired as a result of the use of alcohol or drugs or any combination thereof."[30]

Taken together, Sections 4201 through 4203 establish a set of duties for drivers involved in collisions in Delaware.[31] On its face, Section 4201 requires a driver involved in a collision resulting in *apparent damage* to property to "immediately undertake reasonable efforts to ascertain whether any person involved in the collision was injured or killed."[32] Section 4202 requires drivers involved in a collision to stop and render reasonable assistance to those who have been harmed. Drivers logically must have knowledge that a collision has occurred before the duty to stop and render assistance can be triggered. It is not reasonable to believe the General Assembly intended for a penalty to be imposed for failure to perform certain duties if the driver was unaware of the

---

[30] *Id.* § 4203(a).

[31] The Court of Chancery summarized these statutory duties in *Jacobs v. City of Wilmington*:

> A driver involved in a traffic accident in Delaware is charged with a series of statutory duties. Whenever an accident apparently results in property damage, the driver must stop, and ascertain whether there was an injury. If another party was indeed injured, the driver must render "reasonable assistance," and provide the other driver with her license and other pertinent information. If there is apparent property damage to the other vehicle, the driver must also stay at the scene of the accident.

> In addition, after fulfilling the above requirements, [Section] 4203(a) holds that [a] driver of a vehicle involved in an accident must report it to the police whenever (1) injury or death occurs, (2) either driver appears to be impaired by alcohol or drugs, or (3) there is apparent property damage of $500 or more . . . .

2002 WL 27817, at *4 (Del. Ch. Jan. 3, 2002) (Strine, V.C.) (citations omitted).

[32] 21 *Del. C.* § 4201(a).

11

collision.[33] The State's failure to prove beyond a reasonable doubt that the defendant had knowledge of the collision would require a verdict of not guilty.

Thus, based on our reading of Sections 4201 and 4202, we conclude that the General Assembly intended that the State must prove that the defendant had knowledge that a collision occurred but failed to stop. Because we discern a requisite mental state from the language of the relevant statutory provisions, the default mental state provision of Section 251(b) does not apply.

Further, we reject Pardo's contention that if knowledge is required, then actual or constructive knowledge of injury or death is an element of the offense. Requiring knowledge of death or injury would be incompatible with the General Assembly's intent. That drivers are statutorily required by Section 4201 to stop and investigate the consequences of a collision suggests that the General Assembly intended that the duty to render aid would be triggered regardless of whether the driver knows prior to stopping that a person has been injured or killed.

One obvious purpose of the statute is to ensure that persons injured in accidents receive prompt medical attention. One who is involved in the collision may be in the best

---

[33] *See State v. Osika*, 1988 WL 1017754, at *2 (Del. Com. Pl. July 19, 1988) ("The offense of leaving the scene of an accident makes little sense unless knowledge of the occurrence of an accident is part of the offense. The purpose of the statute is to prohibit the automobile driver involved in an accident to evade his responsibilities by escaping or departing before his [identity is] made known. The statute requires an affirmative course of action by the driver. It follows that a driver cannot perform the duty required by statute unless he has knowledge of the facts giving rise to such duty. Although most motor vehicle statutes do not require proof of a state of mind, it is inconceivable that the legislature would make the statute in this case applicable to a person that was ignorant of the fact that the automobile that he was driving was involved in an accident.").

position to ensure that those who are injured might receive the earliest possible medical attention. Requiring the State to prove the defendant's knowledge of the consequences of a collision would defeat the purpose of the statute by encouraging drivers to avoid knowledge by fleeing, rather than stopping to investigate whether anyone was seriously injured or killed. The General Assembly's decision to enhance the penalty for violation of Section 4202(a) to a felony punishable by a minimum of six months' imprisonment where death is involved furthers this purpose by removing the incentive for intoxicated drivers to flee the scene of a collision rather than stay and render assistance.[34]

Moreover, requiring the State to prove the defendant's knowledge of death or injury would place an unrealistic burden on the prosecution. Although the State can prove a defendant's knowledge that a collision occurred inferentially using circumstantial evidence,[35] proving that a defendant had actual knowledge that someone was injured or killed would be extremely difficult in view of the defendant's flight from the scene.

---

[34] The synopsis for Senate Bill 154, which elevated violation of Section 4202(a) resulting in death from a class A misdemeanor to a class E felony, provides that "[t]his Act will ensure that drivers who flee the scene of an accident which results in death will be adequately punished." Del. S.B. 154 syn., 141st Gen. Assem. (2001). The felony provision of Section 4202(c) provides that violation of Section 4202(a) "resulting in death to any person" constitutes a class E felony and mandates that "the sentence for such offense shall include a period of incarceration of not less than 1 year and the first 6 months of any sentence imposed shall not be suspended." 21 *Del. C.* § 4202(c). Collisions resulting in injuries, but not death, remain punishable as unclassified misdemeanors. *Id.* § 4202(b).

[35] *See Osika*, 1988 WL 1017754, at *2 ("Knowledge of the accident does not have to be shown by direct evidence and the denial of knowledge of the accident by the accused does not need to be accepted at face value. It is sufficient if the event occurs under circumstances that raise an inference of knowledge on the part of the fleeing driver.").

A number of jurisdictions with hit-and-run offenses have statutes that expressly contain an element of knowledge.[36] Courts in these jurisdictions are divided as to whether the knowledge element in the statute requires only knowledge that the collision occurred, or whether the state must also prove the defendant's knowledge that the collision resulted in injury or damage.[37] Here, the most analogous cases are those arising in jurisdictions where statutes are silent as to a mental state. As discussed above, silence does not dispense with the *mens rea* inquiry.[38] The vast majority of courts construing these statutes have determined that knowledge is required,[39] but they are divided as to whether knowledge of the collision alone is required to hold a driver accountable,[40] or

---

[36] *See* Marjorie A. Caner, Annotation, *Necessity and Sufficiency of Showing, in Criminal Prosecution under "Hit-And-Run" Statute, Accused's Knowledge of Accident, Injury, or Damage*, 26 A.L.R.5th 1, §§ 4[a]-[b] (1995).

[37] *See id.*

[38] *See Staples*, 511 U.S. at 605.

[39] We encountered only one state that imposes strict liability for hit-and-run collisions where the statute is silent with respect to the mental culpability required to secure a conviction. *See People v. Manzo*, 144 P.3d 551, 556, 558-59 (Colo. 2006) (noting that the state's interest in "enforc[ing] driver responsibility would be thwarted" if drivers "could avoid punishment for Leaving the Scene of an Accident with Serious Injury by failing to have actual knowledge regarding his or her involvement in the accident," and that imposing strict liability was constitutional despite the resulting felony conviction because the statute constitutes a public welfare offense and the penalties, including up to eight years imprisonment, "are small in comparison to many common law crimes" (citations omitted)); *see also People v. Hernandez*, 250 P.3d 568, 573 (Colo. 2011) (*en banc*) (describing the Colorado hit-and-run statute as a "strict liability offense" (citing *Manzo*, 144 P.3d at 555, 558)).

[40] For example, in Nevada, the prosecution must prove that the driver had actual or constructive knowledge that he or she was involved in a collision. *Clancy v. State*, 313 P.3d 226, 230-31 (Nev. 2013). However, "actual or constructive knowledge of injury or death is not an element of the felony offense of leaving the scene of an accident." *Dettloff v. State*, 97 P.3d 586, 590 (Nev. 2004) (citation omitted). As the Supreme Court of Nevada has reasoned, "to hold otherwise would encourage 'hasty retreats' from accident scenes by at-fault or impaired drivers to avoid gaining knowledge that someone had been injured and, correspondingly, avoid criminal responsibility under the hit-and-run statute." *Id.* Similarly, in Washington, "[k]knowledge of the

whether the prosecution must prove both the driver's knowledge of his involvement in a collision and that he knew death or injury resulted.[41]  Jurisdictions in the latter category typically require knowledge of the injuries sustained as a result of the accident, or that the accident was of such a nature that a person involved in it would reasonably anticipate that bodily injury or death had occurred.[42]

_____

accident is all the knowledge that the law requires."  *State v. Vela*, 673 P.2d 185, 188 (Wash. 1983) (*en banc*); *see also State v. Hayes*, 2010 WL 3639903, at *3 (Wash. Ct. App. Sept. 21, 2010) (describing the elements of Washington's hit-and-run offense as "(1) an accident resulting in injury to a person; (2) the failure of the defendant driver to stop in order to provide contact information and to render reasonable assistance; and (3) the driver's knowledge of the accident." (citing *State v. Sutherland*, 15 P.3d 1051, 1056 (Wash. Ct. App. 2001))).

[41] *See State v. Al-Naseer*, 734 N.W.2d 679, 684-89 (Minn. 2007) (surveying jurisdictions); *State v. Mancuso*, 652 So. 2d 370, 371-72 (Fla. 1995) (collecting cases); *see generally* Caner, *supra* note 36, at §§ 3[a]-[b].

[42] *See, e.g.*, *Kimoktoak v. State*, 584 P.2d 25, 32 (Alaska 1978) (concluding that, due to the potential maximum imprisonment of ten years for failing to stop and render assistance, "it is not sufficient to show merely that [the defendant] had knowledge of the accident or collision[,]" but that requiring proof of actual knowledge of injury or death would place an unreasonable burden on the prosecution because the very nature of the offense may foreclose such knowledge); *see also Payne v. Commonwealth*, 674 S.E.2d 835, 842 (Va. 2009) ("[T]he Commonwealth must prove that the defendant possessed actual knowledge of the occurrence of the accident, and such knowledge of injury which would be attributed to a reasonable person under the circumstances of the case." (alteration in original) (quoting *Kil v. Commonwealth*, 407 S.E.2d 674, 679 (Va. Ct. App. 1991)).  Many of the jurisdictions requiring knowledge of the injury rely on the *Holford* rule articulated by the Supreme Court of California, which provides that "criminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." *People v. Holford*, 403 P.2d 423, 427 (Cal. 1965) (*en banc*) (footnote omitted); *see State v. Miller*, 308 N.W.2d 4, 7 (Iowa 1981) (adopting the *Holford* rule); *State v. Sidway*, 431 A.2d 1237, 1240 (Vt. 1981) (applying *Holford* and similar cases to hold that "[i]f an impact occurs under such circumstances that a reasonable person would anticipate injury to person or property, knowledge of that fact is imputed to the driver"); *State v. Porras*, 610 P.2d 1051, 1054 (Ariz. Ct. App. 1980) ("We adopt both the reasoning and the interpretation of the scienter requirement made by the California court [in *Holford*]."); *State v. Minkel*, 230 N.W.2d 233, 236 (S.D. 1975) (applying *Holford* and observing that "[i]t is difficult to imagine any accident involving contact between an automobile and a bicycle in which a reasonable driver would not know that the collision occurred[,]" and that "[w]hen that collision is serious enough to cause death, the inference that the driver knew of it becomes even stronger"); *see also State v. Tennant*, 319 S.E.2d 395, 401 (W. Va. 1984) (finding the "weight of

15

We conclude that our statutory scheme requires proof of a defendant's knowledge of his involvement in a collision, and that actual or constructive knowledge of injury or death is not an element of the offense. Section 4202 imposes a duty on drivers who know they are involved in a collision to stop and assess whether any harm has occurred to persons or property. In this case, in addition to the direct evidence of knowledge available from Pardo's testimony,[43] the extent of the damage to Pardo's vehicle and the force exercised upon it by the collision support the Superior Court's finding that Pardo knew that the vehicle he was driving was involved in a collision.[44] Accordingly, we reject Pardo's constitutional challenges to Section 4202 and affirm the Superior Court's conviction under Section 4202.

---

authority" represented by *Holford* persuasive and holding with respect to the version of West Virginia's hit-and-run statute then in effect that the state must "prove that the driver charged with leaving the scene of an accident knew of the accident and the resulting injury or death or reasonably should have known of the injury or death from the nature of the accident").

[43] *See, e.g.*, App. to Answering Br. at B237 (Tr. 53:17-18) ("I knew I had an accident, you know, that my car struck a limb, now I know it's not."); *id.* at B251 (Tr. 112:2) ("[W]e were shocked after the impact . . . ."); *id.* at B266 (Tr. 169:17-20) (Pardo admitting that when he called the New Castle County Police Department, he stated that he had struck a deer or a stick); *id.* at B305 (Tr. 65:7-8) ("I knew I—I struck something so I knew the car will have had some damage.").

[44] Immediately following the collision, Pardo's vehicle left the roadway. *See, e.g.*, App. to Opening Br. at A42 (Tr. 142:5-21). Pardo acknowledged that the collision caused serious damage to his vehicle, rendering it unsafe to drive. *Id.* at A173 (Tr. 156:5-14). This damage included removal of portions of the front grill of the vehicle, a cracked windshield, a dented hood and roof, and destruction of the glass in the sunroof. *See id.* at A51 (Tr. 193:5-12); *id.* at A52 (Tr. 197:7-17); *id.* (Tr. 198:6-12); *id.* at A98 (Tr. 28:2-20). Additional evidence is summarized in Section C.2. herein.

### C. *Pardo's Other Claims Lack Merit*

**1. The Superior Court Did Not Abuse Its Discretion By Considering Evidence of Pardo's Voluntary Intoxication as Relevant to the Manslaughter Charge**

Pardo contends that the Superior Court erred by including a voluntary intoxication instruction in its statement of the law with respect to manslaughter.[45] He contends that the trial court's consideration of the voluntary intoxication standard undermined the need for the State to demonstrate that Pardo's conduct involved a *conscious* disregard of an unjustifiable risk. He agrees that we review this issue for abuse of discretion.[46]

To secure a conviction for manslaughter, the State was required to prove beyond a reasonable doubt that Pardo recklessly caused Bishop's death.[47] The State requested that the pattern jury instructions for manslaughter include the italicized language from 11 *Del. C.* § 231 below, defining the "reckless" state of mind:

> A person acts recklessly with respect to an element of an offense when the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. *A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.*[48]

---

[45] Although this case was not tried before a jury, the Superior Court explained that it would be "bound by the same legal instructions in considering the evidence as the Court would instruct a jury." *Id.* at A219 (Tr. 108:5-8).

[46] *Wright v. State*, 953 A.2d 144, 148 (Del. 2008) ("[This Court] will review a refusal to give a 'particular' instruction (that is, an instruction is given but not with the exact form, content or language requested) for an abuse of discretion." (citations omitted)).

[47] *See* 11 *Del. C.* § 632 ("A person is guilty of manslaughter when: (1) The person recklessly causes the death of another person . . . .").

[48] 11 Del. C. § 231(e) (emphasis added).

17

Over Pardo's objection, the trial court included and considered the language. Pardo claims error, asserting that "there was *no evidence* of voluntary intoxication . . . ."[49] Pardo is incorrect. At trial, Pardo testified that, during the afternoon and evening on the day of the collision, he consumed six to seven alcoholic drinks, including one margarita, part of a second margarita, three beers, and two shots of tequila.[50] From this evidence, the Superior Court inferred that Pardo was less able than he would ordinarily have been to exercise clear judgment, sufficient physical control, or due care in the driving of his vehicle. The Superior Court properly considered Pardo's alcohol consumption as it related to his state of mind. The Superior Court, in its opinion denying Pardo's post-trial motions, stated that:

> It is not an element of the offense of Manslaughter or any other offense with which Defendant was charged that Defendant was impaired or intoxicated and the Court expressly stated that it did not make a legal finding that Defendant was impaired or intoxicated at the time of the accident. Rather, the Court found that, after consuming 6-7 alcoholic drinks prior to the operating a motor vehicle within 1.5-5 hours prior to the accident, Defendant was "under the influence" of alcohol, consistent with Delaware statutory law which provides that a person is "under the influence" of alcohol when that person is "less able than the person would ordinarily have been, either mentally or physically, to exercise clear judgment, sufficient physical control, or due care in the driving of a vehicle."[51]

On this record, we find no abuse of discretion, as the challenged language from Section 231 was an accurate statement of the law that was supported by the facts in evidence.

---

[49] Reply Br. at 6 (emphasis in original).

[50] *See* App. to Opening Br. at A180-81 (Tr. 195:22-199:19).

[51] *Pardo*, 2015 WL 6945310, at *5 n.38 (quoting 21 *Del. C.* § 4177(c)(11)).

**2. The Superior Court Properly Denied Pardo's Motion for Judgment of Acquittal**

Pardo contends that the Superior Court erred in denying his motion for judgment of acquittal, arguing that the court did not consider all the facts in evidence. Additionally, he contends that the Superior Court improperly considered certain evidence. We review the denial of a motion for judgment of acquittal *de novo* "to determine 'whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt.'"[52]

Pardo's argument that the Superior Court did not consider all the facts in evidence lacks merit. In this bench trial, the court as finder of fact was free to accept or reject any or all of the sworn testimony, as long as it considered all of the evidence presented. After reviewing the parties' arguments and the record in this case, we see no basis from which to conclude that the Superior Court failed to appropriately consider the evidence. Given the evidence presented at trial, including particularly Pardo's "strategy" of intentionally driving partially in the oncoming lane of traffic on a narrow, winding road,[53] a rational finder of fact could find the defendant guilty of manslaughter beyond a reasonable doubt.

Pardo also challenges the Superior Court's finding that Bishop was lawfully riding his bicycle when the collision occurred. The Superior Court, as finder of fact, inferred that Bishop rode his bicycle in compliance with the law based on the evidence, including

---

[52] *Milton v. State*, 67 A.3d 1023, 2013 WL 2721883, *2 (Del. June 11, 2013) (TABLE) (quoting *Monroe v. State*, 28 A.3d 418, 430 (Del. 2011)).

[53] *See, e.g.*, App. to Opening Br. at A158 (Tr. 87:15-16) ("I tend to be a little bit over the other line. I think it's safer."); *id.* at A186 (Tr. 218:22-219:1) ("I regularly drive a little bit over the yellow line at night in that particular road.").

19

illuminated bicycling equipment that was found in the debris.[54]  Although Pardo

disagrees with this inference, he does not contend that the bicycle equipment evidence

was improperly admitted, and we find no merit to his challenge of the trial court's

finding.

Finally, Pardo contends that the Superior Court improperly considered "double" or

"triple" hearsay in the form of a recorded statement that the State offered pursuant to 11

*Del. C.* § 3507.  Although trial counsel raised a foundational objection to the 3507

statement at issue, the State cured the alleged foundational defect.  Pardo's trial counsel

never made a hearsay objection.  Accordingly, Pardo's argument that the 3507 statement

constituted inadmissible hearsay was not raised to the trial court and therefore is

reviewed for plain error.

Pardo's three sons were in the vehicle at the time of the collision.  In the 3507

statement at issue, one of the children, J., stated that one of his brothers, G., asked Pardo,

"Did you kill a person?"[55]  Both J. and G. testified at trial, and G. testified first.[56]  The

---

[54] *See id.* at A262 (Tr. 20:13-18).

[55] A video of J.'s statement was played for the Superior Court by the State during J.'s testimony. *Id.* at A92 (Tr. 144:8).  Although G. also made a statement, the State did not introduce it.  After the brothers had testified, Pardo's trial counsel offered an eight-second excerpt from G.'s statement as a court exhibit.  *See* App. to Answering Br. at B234 (Tr. 42:18-21).  The parties stipulated to the use of the excerpt without requiring G. to be recalled to the stand.  *Id.*  During closing arguments, trial counsel replayed the portion of J.'s statement in which J. says he heard G. ask the question.  *Id.* at B346 (Tr. 14:9-22).  Trial counsel then played the eight-second excerpt from G.'s statement.  *Id.* (Tr. 15:6).  According to trial counsel's summation, the statement shows that G. was asked whether he saw anything, and G. responded that he did not. *Id.* (Tr. 15:7-11).

[56] *See* App. to Answering Br. at B122-27 (Tr. 108:11-127:12) (testimony of G.); *id.* at B127-33 (Tr. 127:14-152:3) (testimony of J.).

20

State failed to ask G. during his testimony whether G. in fact asked the question.[57] The 3507 statement was then played during J.'s testimony. Pardo asserts that the State intentionally sought to deprive him of the opportunity to effectively confront G. about the question that J. attributed to G. in the 3507 statement. Pardo did not make this argument in the trial court. Instead, he raises it for the first time on appeal, and the State fails to address it on appeal in the single paragraph it devotes to the Section 3507 issues.

Thus, Pardo presses an issue not fairly presented below that is waived, absent plain error, which does not exist. In order to justify reversal, "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[58] That prejudice is absent here.

Importantly, the son's 3507 statement was only one among numerous pieces of evidence of Pardo's guilt. For example, the Superior Court found the following facts:

- Defendant was "under the influence" of alcohol at the time of the accident.

- While driving on Brackenville Road, Defendant exceeded the posted speed limit of thirty-five (35) miles per hour.

- Prior to the collision, Defendant's sons expressed concern about Defendant's speed and expressed that Defendant was operating the vehicle in a weaving fashion.

- At approximately 8:30 p.m., Defendant consciously and purposely placed his vehicle over the double yellow line. As such, Defendant was not travelling within his designated lane of travel.

- Mr. Bishop was lawfully riding his bicycle on Brackenville Road in his designated lane of travel—the southbound lane. Mr. Bishop was

---

[57] *See id.* at B122-27 (Tr. 108:11-127:12) (testimony of G.).

[58] *Foster v. State*, 961 A.2d 526, 528 (Del. 2008) (quoting *Morgan v. State*, 922 A.2d 395, 402 (Del. 2007)).

21

equipped with appropriate lighting on his bicycle and his person. Among the debris from the collision, Mr. Bishop's illuminated equipment was found.

- Defendant's vehicle and Mr. Bishop's bicycle had a head-on-head collision in the southbound lane of Brackenville Road while Mr. Bishop was travelling southbound in the southbound lane and Defendant was travelling northbound in the southbound lane.

- As a result of the collision, the front of Mr. Bishop's bicycle collapsed while the front wheel twisted. Upon impact, the bicycle flipped onto the hood of Defendant's vehicle, breaking the handlebars and leaving marks across the hood of the vehicle. Upon impact, Mr. Bishop was violently separated from his bicycle and thrown by force into the windshield of Defendant's vehicle in two places—rendering the windshield broken and splintered in a spider-web fashion from two points of impact. After Mr. Bishop smashed into the windshield in two places, Mr. Bishop was thrown over the roof of Defendant's vehicle in full view of the rear seat passenger, Defendant's son, who exclaimed, "Dad you hit someone. You killed a person." The collision caused significant damage to Defendant's vehicle.

- After the collision, Defendant's vehicle drove off the road, leaving tire marks on the unpaved shoulder and dirt path adjacent to the southbound roadway.

- Mr. Bishop's body was further vaulted across the rear hood of the vehicle and came to rest in the path of the vehicle which passed under Mr. Bishop's bruised and broken body on the dirt shoulder of the southbound lane.

- Defendant knew he had been in a collision.

- Defendant did not stop to assess the scene of the collision to determine whether any person was injured or killed.

- After the collision, Defendant drove his vehicle from the unpaved shoulder onto the northbound lane.

- Defendant admitted that his vehicle was not safe to drive after the collision.

- Defendant left the scene of the accident and continued driving approximately three-tenths of a mile to his residence.

- Unlike Defendant who did not stop to render aid to the mortally wounded Mr. Bishop, the first three people who came upon the scene of the accident stopped to ascertain whether someone was hurt. They

22

contacted emergency personnel by dialing 911. Patrick Ritchie first interacted with Mr. Bishop and testified that Mr. Bishop exhaled twice in response to Mr. Ritchie's efforts. By the time Deirdre Ritchie, a nurse, approached Mr. Bishop, Mr. Bishop was still warm but had no pulse and was unresponsive. While Deirdre Ritchie stayed by Mr. Bishop's side, Ms. Shannon Athey directed traffic and Patrick Ritchie briefly left the scene to summon help.

- Upon arrival, New Castle County Police Department officers determined that Mr. Bishop was deceased and therefore no life-saving measures were taken.

- Mr. Bishop died from blunt force trauma inflicted upon him by Defendant's vehicle.

- Upon returning safely to his home, Defendant assessed the damage to his vehicle and found no evidence of foliage or organic matter consistent with a collision of the vehicle with a tree branch.

- While there was no evidence of a tree or branch striking the vehicle, what *was* left behind on the vehicle was Mr. Bishop's DNA on the edge of the sunroof of Defendant's vehicle, as well as scuff marks from the handlebars of the bicycle on the vehicle's hood, pieces of fabric from Mr. Bishop's shirt on the vehicle, and scuff marks across the roof which the Court inferred were made by Mr. Bishop's helmet that remained strapped to his head when Mr. Bishop was vaulted over the roof of the vehicle.

- Defendant did not report the accident to the police until the next morning.[59]

The Superior Court also noted that Pardo's "consciousness of guilt was established by (i) leaving the scene of the accident; (ii) reluctance to report the accident to his employer; and (iii) instinct to 'hide the car' after the accident."[60] Among other findings of Pardo's recklessness, the trial court specifically found that Pardo "made a conscious decision to

---

[59] *Pardo*, 2015 WL 6945310, at *5-7 (emphasis in original) (footnote omitted). Although not mentioned in the Superior Court's findings, the record also shows that J. remembered seeing something "spinning" outside the right side of the vehicle after the impact. *See* App. to Reply Br. at AR-12 (Tr. 148:3-23).

[60] *Pardo*, 2015 WL 6945310, at *7.

use more of the roadway than was legally available to him" and "was exceeding the speed limit after consuming alcohol."[61]

Even excluding the Superior Court's reference to the son's 3507 statement, as well as Pardo's other evidentiary challenges on appeal, the remaining evidence of Pardo's guilt is overwhelming. Thus, we cannot say that, viewing the evidence in the light most favorable to the State, no rational trier of fact could find Pardo guilty beyond a reasonable doubt.[62] Moreover, prior to viewing of the 3507 statement, the State proffered that the statement was either a present-sense impression or an excited utterance.[63] Without ruling (as it had not yet seen the video), the Superior Court stated that it would "only consider that evidence that is appropriate."[64] We see no plain error in the trial court's consideration of the challenged statement. Pardo has not demonstrated that the trial court erred in denying his motion for judgment of acquittal.

### 3. The Superior Court Did Not Err in Denying a Missing Evidence Instruction

Pardo claims on appeal that a reporter recovered several pieces of plastic from the scene of the collision. Although he concedes that the reporter promptly provided this evidence to the police, he contends that this manner of collecting evidence was insufficient because it was not the traditional way that evidence is collected. He asserts that the Superior Court erred by denying his request for a missing evidence instruction.

---

[61] *Id.*

[62] *See Milton*, 2013 WL 2721883, at *2.

[63] App. to Reply Br. at AR-10 (Tr. 137:8-11).

[64] *Id.* at AR-11 (Tr. 143:13-14).

This Court reviews a trial court's denial of a requested jury instruction *de novo*.[65] We agree with the Superior Court that a missing evidence instruction was not required because the State did not fail to collect and preserve the evidence.

## IV.    CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is AFFIRMED.

---

[65] *Weber v. State*, 38 A.3d 271, 274 (Del. 2012) (citing *Lunnon v. State*, 710 A.2d 197, 199 (Del. 1998)).