# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MORTGAGE CONNECT DOCUMENT SOLUTIONS, LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. N23C-01-178 MAA CCLD |
| GREEN INDUSTRIAL DEVELOPMENT GROUP, LLC, | ) ) ) | |
| Defendant. | ) ) | |

Submitted: October 20, 2025
Decided: January 20, 2026

## POST-TRIAL MEMORANDUM OPINION

Andrew D. Cordo, Esquire (Argued), Jacqueline G. Connor, Esquire, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Michael S. Sommer, Esquire (Argued), of WILSON SONSINI GOODRICH & ROSATI, P.C., New York, New York, *Attorneys for Plaintiff*.

Katherine L. Mowery, Esquire, Gabriela Z. Monasterio, Esquire, of RICHARDS, LAYRON & FINGER, P.A., Wilmington, Delaware; Mark T. Josephs, Esquire (Argued), Lauren Z. Williams, Esquire, Brian H. Oates, Esquire, Matt M. Johnson, Esquire, of JACKSON WALKER LLP, Dallas, Texas, *Attorneys for Defendant*.

**Adams, J.**

## INTRODUCTION

This post-trial opinion resolves disputes regarding a commercial lease between the landlord, Green Industrial Development Group, LLC ("Green"), and the tenant, Mortgage Connect Document Solutions, LLC ("MCDS"). MCDS contends Green wrongfully terminated the lease. Green contends MCDS repudiated the lease while the parties budgeted for a buildout of the space and failed to cooperate during that budgeting process—justifying Green's termination.

For the reasons discussed herein, the Court finds MCDS repudiated the lease, justifying Green's immediate termination of the lease. MCDS's claims therefore fail. Green's claim regarding MCDS's noncooperation is dismissed as moot. Green is entitled to damages and attorneys' fees, costs, and expenses for MCDS's breach. Judgment will be entered accordingly.

## FACTS AND PROCEDURAL HISTORY

### A. The Parties

MCDS is a Delaware LLC providing "mortgage loan services, including document generation, scanning, printing and processing."[1] MCDS conducts a printing operation in Denver, Colorado.[2]

---

[1] Pretrial Stip. ¶¶ 9–10.
[2] Tr. 2/3 at 150:14–19. Citations to the bench trial transcript are in the form of "Tr. 2/X at __." For the third day of trial, February 5, 2025, the Court references the instant trial transcript uploaded to the docket. D.I. 172.

Green is a Delaware LLC.[3]  Green is a real estate development company that serves as developer, general contractor, and manager of warehouse properties.[4]  One of Green's properties is the JAG Logistics Center @ DEN ("JAG Logistics Center"), a business and industrial warehouse park adjacent to Denver International Airport.[5]

## B.  Key Individuals

Jeff Coury ("Coury") is the CEO of MCDS and its parent company, Mortgage Connect LP.[6]  Steve Wilson ("Wilson") managed MCDS's printing operation in Denver at all relevant times for this dispute.[7]  Dan Green is the CEO of Green.[8]

William James served as Green's real estate appraisal expert in this case.[9]  Donald Lochabay was Green's damages expert.[10]  James Farrell was MCDS's rebuttal expert.[11]

## C.  The Parties Negotiate the Lease

In the second half of 2021, MCDS decided to lease a new space for its printing operation in Denver.[12]  MCDS had been operating at a space on Denver's Argonne

---

[3] Pretrial Stip. ¶ 12.
[4] Pretrial Stip. ¶ 13.
[5] Pretrial Stip. ¶ 14.
[6] Pretrial Stip. ¶ 11.
[7] Tr. 2/3 at 15:13–16; 150:20–151:7; JX 1at MCDS001042.
[8] Pretrial Stip. ¶ 15.  To avoid confusing Dan Green with Green the entity, the Court will refer to Dan Green by his full name.
[9] Tr. 2/4 at 225:2–13.
[10] Tr. 2/5 at 7:8–10.
[11] Tr. 2/5 at 91:8–17.
[12] Tr. 2/3 at 12:6–14.

Street (the "Argonne Street Facility").[13]  MCDS sought a space near the Denver

International Airport.[14]  Through brokers, Green and MCDS began negotiating a

lease for space at the JAG Logistics Center.[15]

On April 27, 2022, the Parties executed a lease (the "Lease") governed by

Colorado law.[16]  The Lease concerned 46,280 square feet of warehouse space at the

JAG Logistics Center (the "Premises").[17]  On May 26, 2022, MCDS paid Green

$127,674.86, constituting a deposit and first month's rent for the Lease (the

"Deposit").[18]

The Lease incorporated a "Work Letter," which provided terms for Green to

implement improvements so the Premises would meet MCDS's operational needs.[19]

The Work Letter provided for a $30.00 per square foot "Tenant Allowance."[20]  The

Tenant Allowance was to be used as a credit towards any costs incurred by Green in

implementing improvements pursuant to the Work Letter—MCDS only paid for

Premises improvements above the value of the Tenant Allowance.[21]  If MCDS did

---

[13] Tr. 2/3 at 150:14–19.
[14] Tr. 2/3 at 12:15–21.
[15] JX 11.
[16] Pretrial Stip. ¶ 16; JX 1.  Wilson is listed as the Tenant's Representative in the Work Letter. JX 1 at MCDS001042.  The Work Letter further states that "Authorization made by Tenant's Representative shall be binding and Tenant shall be responsible for all cost authorized by Tenant's Representative."  JX 1 at MCDS001042.
[17] Pretrial Stip. ¶¶ 17–18; JX1 at MCDS001014.
[18] Pretrial Stip. ¶ 21.
[19] Pretrial Stip. ¶ 20; JX 1 at MCDS001039–MCDS001044.
[20] JX 1 at MCDS001040.
[21] JX 1 at MCDS001040–MCDS001041.

not use the Tenant Allowance within twelve months of signing of the Lease, the Tenant Allowance was forfeited.[22]

The Work Letter also provided that, should the cost of the build-out to the Premises exceed the Tenant Allowance, Green must notify MCDS.[23] MCDS could then either have authorized Green to proceed with the buildout, or elected to work with Green to revise the "Working Drawings" (documents that specify the scope of the build-out) so as to reduce the "Excess Cost" (the difference between the actual cost of the build-out and the Tenant Allowance).[24]

The Lease specified that, in the event of a breach, MCDS must be given notice of the breach and thirty days to cure.[25]

### D.    The Parties Wrestle with the Budget for the Build-out.

In March 2022, MCDS worked with Green to formulate a budget for the build-out of the Premises.[26] Wilson worked with Brian Patterson, a consultant MCDS hired as project manager for the build-out, to determine the project scope.[27] MCDS

---

[22] JX 1 at MCDS001040.
[23] JX 1 at MCDS001040.
[24] JX 1 at MCDS001041.
[25] JX 1 at MCDS001029.
[26] JX 25. Notably, MCDS never requested a budget upfront for the project. Tr. 2/4 at 28:21–23. MCDS was likewise aware that there would be no budget proposed "until we have final plans" so that they could "properly budget and make alterations to the plans as needed to remove things." JX 55. *See also* Tr. 2/3 at 167:2–7 (Coury testifying that Wilson requested the budget and was told the budget would not be available until after the final plans were finished).
[27] Tr. 2/3 at 167:12–16; Tr. 2/4 at 28:9–12. Patterson met with Green weekly to discuss the "what they wanted in the space." Tr. 2/4 at 14:11–16. Patterson further "provided meaningful input into the creation of those plan[]s." Tr. 2/4 at 35:20–36:7. After the first budget, Patterson was

4

ultimately approved Working Drawings outlining an extensive build-out in the warehouse.[28]

On September 13, 2022, Green sent Wilson the first budget for the implementation of the Working Drawings (the "First Budget').[29] The total budget was $7,605,410—$164.33 per square foot—with $134.33 per square foot of Excess Cost.[30] In messages with Wilson, Coury expressed his surprise at the magnitude of the First Budget and declared it needed to be dramatically reduced if MCDS were to proceed.[31] MCDS rejected the First Budget on September 20, 2022.[32]

On September 23, 2022, Green sent an updated budget (the "Second Budget").[33] The Second Budget total was $6,761,647—$146.10 per square foot—for the build-out.[34] MCDS rejected the Second Budget on September 27, 2022.[35]

On September 29, 2022, Green sent another revised budget (the "Third Budget"). The Third Budget reflected a total budget of $6,609,900—$142.82 per

---

taken off the project and was no longer part of the discussions on how to re-design the space or have cost-saving ideas. Tr. 2/4 at 36:8–23.

[28] JX 92.

[29] JX 107; Pretrial Stip. ¶ 24.

[30] JX 107; Pretrial Stip. ¶ 24.

[31] JX 116 at MCDS001223; JX 117 at MCDS011490; JX 114 at MCDS001226. Wilson was also aware that the HVAC alone would cost over $1.5 million, and told Dan Green to "go ahead" and approve the HVAC unit so that a price increase could be avoided. JX 99 at GREEN006017; Tr. 2/4 at 46:9–21. Wilson responded to a text from Dan Green that stated "Just sent you the revised budget. I think you and Jeff will be happy. Also we did release the HVAC contractor to secure the equipment so please keep in mind" with a thumbs up. JX 122 at MCDS011487.

[32] Pretrial Stip. ¶ 25.

[33] Pretrial Stip. ¶ 26.

[34] Pretrial Stip. ¶ 26.

[35] Pretrial Stip. ¶ 27.

square foot—for the project.[36]  On September 30, 2022, MCDS rejected the Third Budget.[37]

On October 4, 2022, MCDS asked Green if the build-out cost could be amortized over the term of the Lease.[38]  In his response, Dan Green characterized Green's financial investment into the build-out as "as far as we can go"—Green could not amortize the cost.[39]

### E.    MCDS Commences "Plan B"

On October 4, 2022, Coury received an internal budget estimate for the move to the Premises.[40]  The move budget incorporated the build-out budget from the Third Budget, as well as additional costs, totaling nearly $9 million.[41]  Coury explained, "[t]his is too big of an investment."[42]  Coury asked Wilson for a "plan b asap."[43]  Wilson responded, "Plan B, kill the deal [and] put the new equipment in Argonne.  Maybe able to get some sqft [*sic*] from [the Argonne Street Facility

---

[36] Pretrial Stip. ¶ 28.
[37] Pretrial Stip. ¶ 29.
[38] JX 134 at MCDS009036.
[39] JX 134 at MCDS009036.
[40] JX 138 at MCDS000455.
[41] JX 138 at MCDS000456.
[42] JX 138 at MCDS000454.
[43] JX 138 at MCDS000453.

landlord] if we need it."[44]  Coury replied, "Steve start working on Plan B."[45]  Coury never told Dan Green about "Plan B."[46]

On October 7, 2022, Coury texted a colleague, Chris Staub, regarding the Lease.[47]  Referencing the build-out, Coury remarked "no way am I doing this."[48]  Coury continued, "[t]he Lease is signed and we may have a fight with the landlord."[49]  The following day, Coury texted Staub to ask if he had real estate counsel and noted that Coury "need[ed] to be able to understand what litigation looks like."[50]

On October 7, 2022, a Xerox employee emailed Wilson to ask where to move one of MCDS's printers.[51]  Wilson responded "We are reevaluating our plans. We will not be moving plant locations but may be moving the location on the current plant floor."[52]

---

[44] JX 138 at MCDS000451.

[45] JX 138 at MCDS000450.  Wilson, in response, told Coury that the "equipment is in line with what we expected," and the "HVAC/Electrical is the biggest component and supply chain cost have pushed that up probably 15%."  JX 138 at MCDS000453.

[46] Tr. 2/3 at 189:1–2.

[47] JX 141 at MCDS011497.  Staub is Coury's main contact at Archwell Solutions, a family office owned by one of the families that owned Mortgage Connect. Tr. 2/3 at 179:15–180:3.

[48] JX 141 at MCDS011497.  Coury also texted that "[w]e signed the lease back in March I don't think our team did the right budget."  JX 141 at MCDS011497.  Coury later texted Staub, "Need to start finding a tent ant [sic].  It will cost us but not doing that build out."  JX 141 at MCDS011497.

[49] JX 141 at MCDS011497.

[50] JX 145 at MCDS011498.

[51] JX 143 at MCDS009249.

[52] JX 143 at MCDS009249 (emphasis added).  During this time, Coury was also speaking with Jordan Glick, and had discussions with Glick about how it would "take some where between 1,5

On November 7, 2022, Wilson wrote to the landlord representative for the Argonne Street Facility that MCDS would move forward on an extra 10,500 square feet in the Argonne Street Facility.[53]

## F.    Discussions Between MCDS and Green Break Down.

On October 11, 2022, Dan Green, Coury, and other personnel for MCDS and Green joined a conference call to discuss the path forward.[54]  MCDS broached the subject of subleasing the Premises.[55]  Dan Green was disappointed, especially because Dan Green and MCDS's broker agreed that subleasing was not a viable prospect for the unfinished space.[56]

That same day, Dan Green messaged his staff and told them to show the Premises to another prospective tenant.[57]  Dan Green decided to show the space because "[i]t was pretty clear to [him] that [MCDS] was seriously considering not moving forward with the facility and therefore [Green] would have vacant space on [their] hands."[58]  Dan Green also understood that, if the MCDS deal fell apart, Green had a duty to mitigate damages.[59]  Green did not tell MCDS it was showing the

---

[sic] or 2 mill for a buyout."  JX 150 at MCDS011548.  Jordan Glick is another employee of Archwell Solutions. Tr. 2/3 at 210:11–12.

[53] JX 174 at MCDS011482.

[54] JX 146 at GREEN001923; Tr. 2/4 at 67:14–68:18.

[55] Tr. 2/4 at 68:19–69:3.

[56] Tr. 2/4 at 69:14–70:2.

[57] JX 147 at GREEN010368.

[58] Tr. 2/4 at 72:1–4.

[59] Tr. 2/4 at 73:3–10.

space.[60]  Dan Green explained he decided not to tell MCDS because he wanted the Parties focused on "finding a path forward."[61]  Simultaneously, MCDS was considering a buyout of the Lease.[62]

On October 19, 2022, Green sent MCDS a Notice of Default and Tenant Delay (the "First Notice").[63]  The First Notice contended MCDS failed to "approve" the Second Budget by September 28, 2022, and that this action violated the Lease and Work Letter.[64]

The First Notice also set the "Commencement Date" of the Lease, pursuant to Section 4 of the Work Letter, as no later than March 1, 2023.[65]  The Lease did not have a set Commencement Date, instead leaving that date for resolution later in the build-out process.[66]  Section 4 of the Work Letter provided for the setting of the Commencement Date based on the completion of the build-out, and further provided, if MCDS delayed the build-out in violation of the Work Letter and Lease, Green could set the date of completion of the build-out based on its reasonable estimate of when the project *should* have been done.[67]  That completion date would

---

[60] JX 147 at GREEN010367.
[61] Tr. 2/4 at 73:11–21.
[62] JX 150 at MCDS011548.
[63] JX 164 at MCDS001006–MCDS001007.
[64] JX 164 at MCDS001006.
[65] JX 164 at MCDS001006.
[66] JX 1 at MCDS001014.
[67] JX 1 at MCDS001040.

thereby form the Commencement Date for the Lease.[68]   Green put MCDS on the clock.

Despite the First Notice, Green continued to work to reduce the Excess Cost. Dan Green set up a call with Wilson in which he presented alternatives to certain elements of the Working Drawings.[69]   The result was a "back of the napkin" proposed budget (the "Fourth Budget").[70]  MCDS rejected the Fourth Budget.[71]  That same day, November 7, 2022, Wilson contacted the Argonne Street Facility landlord regarding extra space at the Argonne Street Facility.

On November 9, Coury emailed Dan Green regarding the Fourth Budget.[72] Coury asked Green, "is it your position that it is impossible to meet [MCDS's] needs at or near the [Tenant Allowance]?  If that is your position, what do you suggest we do next?"[73]

---

[68] JX 1 at MCDS001014; MCDS001040.
[69] JX 170 at MCDS007829.
[70] JX 171 at MCDS007880.
[71] JX173 at MCDS007888.
[72] JX 175 at MCDS000010.
[73] JX 175 at MCDS000010.

### G. The Smaller Space Proposal, December 28 Text, and the End of All Budget Negotiations

On December 5, 2022, Dan Green wrote Coury to offer that MCDS take a smaller space at the JAG Logistics Center (the "Smaller Space Proposal").[74] Coury responded that he would review the Smaller Space Proposal.[75]

On December 12, Dan Green texted Coury to ask for his thoughts on the Smaller Space Proposal.[76] On December 28, 2022, Coury sent Dan Green the following text message (the "December 28 Text"):

> Dan hope all is well and you are enjoying your vacation. I worked with my team and your latest proposal does not work. We cannot take the space. I wanted to get to you sooner than later so you can continue to market the space to others. This process, unfortunately has caused my business a lot of issues with operations with delays of equipment, capacity, and client boarding. We have no choice but to look at the other alternatives. Wish you the best. Jeff[77]

That text is the nexus of this lawsuit.

On January 5, 2023, Coury and Dan Green spoke on the phone.[78] Coury explained the Smaller Space Proposal was not adequate and, when Dan Green brought up the full Premises in the Lease, explained that MCDS needed the Excess

---

[74] JX 180 at MCDS000769–MCDS000770.
[75] JX 180 at MCDS000769.
[76] JX 186 at GREEN010784; Tr. 2/4 at 189:12–190:16.
[77] JX 189 at GREEN010788.
[78] Tr. 2/3 at 124:3–125:4.

Costs to be reduced before MCDS could agree to the budget.[79] Dan Green explained that was not workable.[80] Coury asked Dan Green to return MCDS's Deposit.[81]

On January 11, 2023, Wilson cancelled a contract for the installation of a vault at the Lease Premises.[82]

On January 12, 2023, Counsel for Green sent MCDS a Notice of Default, Tenant Delay, and Termination of Lease.[83] In the Notice, Green outlined its understanding that MCDS was refusing to proceed with the Lease—that it had repudiated.[84] Counsel for MCDS responded via a letter on January 13, 2023, rejecting Green's contention that MCDS was in default under the Lease.[85] In that January 13, 2023 letter, MCDS asked Green to return the Deposit.[86]

Green never secured a long-term replacement tenant for the Premises.[87] Green leased the Premises on a short-term basis to two different replacement tenants.[88]

---

[79] Tr. 2/3 at 124:3–125:4.
[80] Tr. 2/3 at 124:3–125:4.
[81] Tr. 2/4 at 84:8–85:13.
[82] JX 194 at MCDS007597.
[83] JX 195 at MCDS000358–MCDS000359.
[84] JX 195 at MCDS000359.
[85] JX 197 at MCDS011411.
[86] JX 197 at MCDS011412.
[87] Tr. 2/4 at 87:4–11.
[88] Tr. 2/4 at 86:15–87:3

## H.    Procedural History

MCDS filed this action on January 19, 2023, seeking a declaration that Green breached the Lease and the return of MCDS's Deposit.[89]  On August 27, 2024, the Parties filed cross-motions for summary judgment.[90]  The Court denied the motions for summary judgment in a bench ruling on November 4, 2024.[91]  On January 24 and 31, 2024, the Court resolved various pretrial motions filed by the Parties.[92]

The Court held a three-day bench trial from February 3–5, 2025.[93]  On February 26, 2025, MCDS filed their Opening Post-Trial Brief.[94]  On March 19, 2025, Green filed their Opening Post-Trial Brief.[95]  On April 9, 2025, MCDS filed their Reply Brief.[96]  Green filed their Reply Brief, on April 23, 2025.[97]  The Court heard post-trial oral argument on July 10, 2025.[98]

---

[89] D.I. 1.
[90] D.Is. 80–83.
[91] D.I. 108.
[92] D.Is. 134, 148.
[93] D.I. 150.
[94] D.I. 156 ["MCDS Opening"].
[95] D.I. 163 ["Green Opening"].
[96] D.I. 167 [ "MCDS Reply"].
[97] D.I. 169 ["Green Reply"].
[98] D.I. 173.  The transcript from the post-trial argument, which is integral to the Court's decision, became available on October 19, 2025.

## STANDARD OF REVIEW

In a bench trial, the judge, as fact-finder,[99] "must assess the credibility of each witness and determine the weight given to the testimony."[100] To reach a verdict on the issues, the court considers admitted exhibits, the testimony of witnesses, the parties' arguments, and Delaware law.[101] The court can consider "each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that according to the evidence, could affect the credibility of the testimony."[102] After reviewing the evidence presented, the court is "free to accept or reject any and or all sworn testimony."[103]

A party bears the burden of proving its claims by a preponderance of the evidence.[104] Proof by a preponderance of the evidence means "proof that something

---

[99] *See, e.g., Shallcross Mortg. Co. v. Ewing*, 2024 WL 3738713 at *1 (Del. Super. Aug. 9, 2024) (citing *Torres v. Bishop*, 2021 WL 6053870, at *4 (Del. Super. Dec. 21, 2021)).

[100] *Williams v. Bay City, Inc.*, 2009 WL 5852851, at *1 (Del. Super. Dec. 23, 2009) (internal citations omitted).

[101] *Outbox Sys., Inc. v. Trimble, Inc.*, 2024 WL 1886089, at *7 (Del. Super. Apr. 30, 2024).

[102] *Zenith Energy Terminals Joliet Hldgs. LLC v. CenterPoint Props. Tr.*, 2024 WL 3570165, at *3 (Del. Super. July 29, 2024) (citing Super. Ct. Civ. Pattern Jury Instruction 23.9).

[103] *Pardo v. State*, 160 A.3d 1136, 1150 (Del. 2017).

[104] *See, e.g., Navient Sols., LLC v. BPG Off. P'rs XIII Iron Hill LLC*, 2023 WL 3120644, at *10 (Del. Super. Apr. 27, 2023).

14

is more likely than not."[105]  If the evidence presented by the parties "is inconsistent, and the opposing weight of the evidence is evenly balanced, then 'the party seeking to present a preponderance of the evidence has failed to meet its burden.'"[106]  "All elements of a claim must be proven by a preponderance of the evidence, including the plaintiff's damages."[107]

## ANALYSIS

### A.    MCDS Repudiated the Lease.

In this case, the question of liability for breach of the Lease turns on whether Coury's December 28 Text constitutes a repudiation of the Lease.  If Coury repudiated, Green properly terminated the Lease, regardless of the Lease's requirements regarding notice and an opportunity to cure.[108]  If Coury did not repudiate, the Court must investigate whether Green's termination was appropriate.

MCDS contends the December 28 Text did not repudiate the Lease.[109] According to MCDS, the December 28 Text instead rejected the Smaller Space Proposal, as taking the full Premises of the Lease was no longer an option on the

---

[105] *Feenix Payment Sys., LLC v. Blum*, 2024 WL 2768386, at *10 (Del. Super. May 29, 2024).
[106] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545 (Del. Super. 2005) (quoting *Eskridge v. Voshell*, 593 A.2d 589 (TABLE), 1991 WL 78471, at *3 (Del. 1991)).
[107] *Buck v. Viking Holding Mgmt. Co. LLC*, 2024 WL 4352368, at *21 (Del. Super. Sept. 30, 2024) (citation omitted).
[108] *Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020, 1024 (Colo. App. 2005) ("Here, tenant clearly communicated its intent not to perform under the lease, and thus landlord's compliance with the lease provisions requiring notice and opportunity to cure would have been futile acts.").
[109] MCDS Opening at 32–41.

table, having been "committed" to another tenant.[110] MCDS further contends the December 28 Text was not a repudiation as a matter of law, as it did not constitute a "definite and unequivocal manifestation"[111] of MCDS's intent not to perform the Lease.[112] Green contends the December 28 Text repudiated the entire Lease.[113]

As a preliminary matter, the Court is not persuaded that Green took part of the Premises off the table before the December 28 Text. Dan Green denied telling Coury he had committed part of the Premises to another tenant.[114] No documentary evidence presented at trial shows Green committed any part of the Premises to another tenant before the December 28 Text. MCDS bases its contention part of the Premises were committed to another tenant on Coury's unsupported testimony.[115] Further, Green has never had a long-term tenant in the Premises since April 7, 2022.[116] While Green did *show* the Premises to another prospective tenant,[117] the Court does not believe Green *committed* part of the Premises to another tenant.

---

[110] *Id.* at 32–37.
[111] *Highlands.*, 129 P.3d at 1023.
[112] MCDS Opening at 37–41.
[113] Green Opening at 34–37.
[114] Tr. 2/4 at 16:7–11, 87:4–11, 186:2–13.
[115] Tr. 2/3 at 217:17–23.
[116] Tr. 2/4 at 16:12–15, 87:4–11.
[117] JX 147 at GREEN010367.

Under Colorado law, a repudiation occurs "upon a party's definite and unequivocal manifestation of its intention that it will not perform as required by the contract."[118]

> A repudiation of a contract must consist of a party's present, positive, unequivocal refusal to perform the contract, not a mere threat to abandon its obligations under the contract. A mere expression of doubt as to a party's willingness or ability to perform is not enough to constitute a repudiation. A repudiation must be apparent in the objective sense.[119]

While the text of an alleged repudiation message itself serves as the focus of the Court's inquiry, the Court may look to the alleged repudiator's post-message conduct to determine whether that party has repudiated.[120]

> The December 28 Text supports Green's position:

> Dan hope all is well and you are enjoying your vacation. I worked with my team and your latest proposal does not work. We cannot take the space. I wanted to get to you sooner than later so you can continue to market the space to others. This process, unfortunately has caused my business a lot of issues with operations with delays of equipment, capacity, and client boarding. We have no choice but to look at the other alternatives. Wish you the best. Jeff[121]

---

[118] *Highlands*, 129 P.3d at 1023 (citation omitted).

[119] *Quinn v. City of Evans Police Dep't*, 2009 WL 2241955, at *5 (D. Colo. July 24, 2009) (citation modified).

[120] *See Lawry v. Palm*, 192 P.3d 550, 559 (Colo. App. 2008) ("Even if these e-mails, standing alone, were not sufficiently positive to establish that defendant intended to repudiate the employment portion of the agreement by resigning from FPA, they were accompanied by defendant's breach by nonperformance and, thus, they amounted to a repudiation. For example, the evidence demonstrates that defendant ceased performing his employment obligations under the agreement after November 23, and there was no discussion between the parties or between their attorneys that defendant wanted to continue working for FPA.").

[121] JX 189 at GREEN101788.

17

MCDS contends the "space" referenced in the December 28 Text, and the "latest proposal," both refer to the Smaller Space Proposal.[122] Dan Green admitted on cross examination that the terms "space" and "latest proposal" reference the Smaller Space Proposal.[123] The context surrounding the message supports such a reading, as the December 28 Text answered a December 12 Text from Dan Green to Coury asking for Coury's thoughts on the Smaller Space Proposal.[124]

Even accepting that the "space" and "latest proposal" refer to the Smaller Space Proposal, the second half of the text conveys MCDS's repudiation. Starting with the ending, the phrase "wish you the best" concludes the December 28 Text with a statement of finality—that MCDS was done negotiating budgets and wanted to terminate the relationship. The December 28 Text concludes with a farewell sendoff, connoting the end of a dialogue.

In the third-to-last sentence, Coury refers to "this process" as having caused disruptions to MCDS's normal business activities. Coury is clearly referring to the entire build-out budget approval process. He cannot be referencing only the Smaller Space Proposal, as that Proposal was on the table for less than a month.[125]

---

[122] MCDS Opening at 34–5.
[123] Tr. 2/4 at 191:2–7.
[124] JX 186; Tr. 2/4 at 189:12–190:16.
[125] Tr. 2/4 at 185:5–12.

Investigating the Smaller Space Proposal was not occurring for enough time to be the "process" that caused disruption to MCDS's business.

Within the context of the message, the second-to-last sentence is inextricably tied to the third-to-last sentence. The third-to-last sentence describes MCDS's problem: the budgeting process is causing disruption to the business (with no end in sight). The second-to-last sentence provides the solution to that problem: MCDS will seek alternative options for a lease. Thus, because the third-to-last sentence refers to the entire budgeting process, the following sentence does the same. That second-to-last sentence's declaration that MCDS would pursue other options provides the most damaging evidence supporting repudiation.

The Court acknowledges that, under Colorado law, a mere threat to abandon one's obligations does not constitute a repudiation.[126] Were the December 28 Text followed up by MCDS's continued efforts to negotiate a budget, perhaps the Court would not find a repudiation. Instead, as in *Lawry v. Palm*, an "inartful" repudiating message was paired with a subsequent failure to walk back the repudiation.[127]

On January 5, 2023, Coury and Dan Green had a phone call to follow up on the December 28 Text.[128] Coury reiterated the inadequacy of the Smaller Space Proposal and, when Dan Green brought up the full Premises in the Lease, explained

---

[126] *Quinn*, 2009 WL 2241955, at *5 (citation omitted).
[127] *Lawry*, 192 P.3d at 556.
[128] Tr. 2/3 at 124:3–125:4.

that MCDS needed the Excess Costs to be reduced before MCDS could agree to the budget.[129] Dan Green explained that was not workable.[130] Coury asked Dan Green to return MCDS's Deposit, clearly signaling intent not to proceed with the Lease.[131]

On January 11, 2023, Wilson cancelled a contract for the installation of a vault at the Lease Premises.[132] MCDS's decision to cancel a third-party contract, which formed part of the buildout, further evidences their intent not to move into the Lease Premises.[133]

On January 12, 2023, Counsel for Green sent MCDS a Notice of Default, Tenant Delay, and Termination of Lease.[134] In the Notice, Green explains its understanding that MCDS was refusing to proceed with the Lease—that it had repudiated.[135] Counsel for MCDS responded via a letter on January 13, 2023.[136] MCDS did not walk back the repudiation, or ask Green to resume Budget negotiations. Instead, MCDS again asked Green to return the Deposit.[137]

---

[129] Tr. 2/3 at 124:3–125:4.
[130] Tr. 2/3 at 124:3–125:4.
[131] Tr. 2/4 at 84:8–85:13.
[132] JX 194 at MCDS007597.
[133] The Court also notes the timing of the repudiation: under the Agreement, rent was due in March 2023, with forfeiture of the Tenant Allowance in April 2023. JX 1 at MCDS001039–MCDS001041.
[134] JX 195 at MCDS000358–MCDS000359.
[135] JX 195 at MCDS000359.
[136] JX 197 at MCDS011411–MCDS011412.
[137] JX 197 at MCDS011412.

Between the December 28 Text, MCDS's January 13 Letter, the testimony regarding the January 5 phone call between Dan Green and Coury, and Wilson's cancellation of the Vault Contract (which occurred *before* Green's January 12 Letter terminating the Lease), the Court is convinced MCDS intended to repudiate the Lease via the December 28 Text and maintained its intention of nonperformance after sending the text.

The weight of the evidence at trial reveals MCDS's months-old intention not to perform the Lease. MCDS was implementing its "Plan B"—a plan to "kill the deal."[138] As soon as Coury received the First Budget, he expressed his shock and disapproval of the figure. In a text message regarding the size of the First Budget, he declared "I am not putting that into this building."[139] Coury sent a subsequent message to Wilson explaining that the cost of the build-out needed to be reduced dramatically, including a foreshadowing threat: "*If* we move forward."[140]

Having received an overall relocation budget on October 4, 2022, Coury emailed Wilson, explaining the budget was unacceptable and MCDS needed a "plan b asap."[141] Wilson responded, "Plan B, kill the deal put the new equipment in

---

[138] JX 138 at MCDS000451. While not determinative of the Court's decision, the Court also notes MCDS's financials between 2021 and 2022. In 2021, MCDS had a net income of $5,922,179.41. JX 12 at MCDS011521. In 2022, MCDS had a net *loss* of $3,162,916.58. JX 192 at MCDS011518. This dramatic change in MCDS's financials provides additional context regarding MCDS's repudiation.
[139] JX 117 at MCDS011490.
[140] JX 114 at MCDS001226 (emphasis added).
[141] JX 138 at MCDS000453.

Argonne."[142]   Coury replied, "Steve start working in plan B."[143]   MCDS was planning to "kill the deal"—repudiate the Lease—almost three months *before* the December 28 Text.

A few days later, on October 7, 2022, Coury texted Staub about his problems with the Lease.[144]  Regarding the build-out for the Lease, Coury remarked "no way am I doing this."[145]  Coury continued, "[t]he Lease is signed and we may have a fight with the landlord."[146]  The following day, Coury texted the same colleague to ask if he had real estate counsel and noting that Coury "need[s] to be able to understand what litigation looks like."[147]

On October 7, 2022, a Xerox employee emailed Wilson to ask where to move one of MCDS's printers.[148]  Wilson responded "We are reevaluating our plans. *We will not be moving plant locations* but may be moving the location on the current plant floor."[149]  This declaration that MCDS was not moving was delivered to Xerox *months* before the December 28 Text.

On November 7, 2022, Wilson wrote to the landlord representative for the Argonne Street Facility that MCDS would move forward on getting 10,500 extra

---

[142] JX 138 at MCDS000451.
[143] JX 138 at MCDS000450.
[144] JX 141 at MCDS011497.
[145] JX 141 at MCDS011497.
[146] JX 141 at MCDS011497.
[147] JX 145 at MCDS011498.
[148] JX 143 at MCDS009249.
[149] JX 143 at MCDS009249 (emphasis added).

22

square feet in the Argonne Street Facility.[150]  Getting extra space at the Argonne Street Facility was part of "Plan B" as outlined on October 4, 2022.[151]  Wilson's message to the Argonne Street Facility landlord confirms MCDS's intent to stay at their then-current facility rather than comply with the Lease.

"Plan B" was in the works starting in October, and MCDS's communications show the decision to repudiate was already made.  MCDS conveyed this intent via the December 28 Text and never attempted to walk it back.

MCDS contends it was illogical for it to repudiate the Lease, so Green's position on repudiation is not believable.[152]  As explained in *Lawry*, economic logic is not dispositive in a contractual repudiation analysis.[153]  The court may find a repudiation where the evidence supports repudiation, even if repudiation was not an efficient breach.[154]  Here, the evidence shows MCDS intended to repudiate the Lease and did so via the December 28 Text.

This case is distinct from *Quinn v. City of Evans Police Dept.*, where the court rejected an alleged repudiation as "at worst a mere threat to abandon" the contract.[155]  The allegedly repudiating message was equivocal: the speaker explained that a particular nondisparagement agreement needed to be part of the agreement between

---

[150] JX 174 at MCDS011482.
[151] JX 138 at MCDS000451.
[152] MCDS Opening at 36.
[153] *Lawry*, 192 P.3d at 559–560.
[154] *Id*.
[155] *Quinn*, 2009 WL 2241955, at *7.

the parties, otherwise their deal was unworkable, so the speaker was unsure where that left the parties.[156]

In *Quinn*, the court emphasized the use of uncertain terms in the message, which supported a finding against repudiation.[157] The alleged-repudiation message in *Quinn* was far more ambiguous than Coury's December 28 Text, containing statements like "I'm not sure where that leaves us."[158] Of particular importance to the court was the conditionality of the message—if certain conditions were not met, that would kill the deal.[159] The court explained that a contingent intention not to be bound cannot constitute a repudiation.[160] Coury's December 28 Text contains no conditional language. Finally, the alleged repudiation in *Quinn* ended with a request that the recipient call back, not a final farewell such Coury's closing line in the December 28 Text.[161]

As a policy matter, a finding against repudiation is unsavory. Coury commenced a three-month plan to "kill the deal" with Green, climaxing in the December 28 Text, and concluding with the filing of the instant lawsuit. To find

---

[156] *Id.* at *5.
[157] *Id.* at *7.
[158] *Id.* at *5.
[159] *Id.* at *8. The Court notes that during trial, Coury testified that he was not instructing Wilson to kill the deal, but was rather "instructing him to focus on Plan B." Tr. 2/3 198:11–18. This contradicts the contemporaneous instructions of Coury to "kill the deal," and the Court will credit the contemporaneous evidence over litigation-based testimony. JX 138 at MCDS000451.
[160] *Quinn*, 2009 WL 2241955, at *9.
[161] *Id.* at *5.

farewell messages such as Coury's December 28 Text to be anything other than contractual repudiation would encourage games of chicken. Contractual parties, knowing a deal is on the ropes and intending to kill the deal themselves, would be encouraged to send farewell messages, such as the December 28 Text, and then stare down their counterparty, waiting to see if they blinked first. If the counterparty read the farewell as a repudiation and terminated the contract, the message-delivering party would escape the undesired deal *and then* sue the counterparty for breach. Such gamesmanship is unacceptable. Coury's December 28 Text repudiated the Lease.

Because MCDS repudiated the Lease, Green was not required to follow the notice and opportunity to cure provisions of the Lease—it was entitled to terminate via the January 12, 2023, letter.[162] MCDS breached the Lease.

### B. Green's Claim that MCDS Failed to Cooperate During the Budgeting Process Is Moot.

Green contends MCDS breached the Work Letter by failing to properly cooperate with Green during the budgeting process.[163] MCDS counters that it complied with its obligations regarding cooperation.[164] Because the Court found

---

[162] *Highlands*, 129 P.3d at 1024 ("Here, tenant clearly communicated its intent not to perform under the lease, and thus landlord's compliance with the lease provisions requiring notice and opportunity to cure would have been futile acts.").
[163] Green Opening at 48–52.
[164] MCDS Opening at 30–32.

MCDS repudiated the Lease, Green's noncooperation claim—a separate breach claim concerning the same contracts MCDS repudiated—is moot.

## C.     Green Is Entitled to Damages for MCDS's Breach.

Green's claims for damages fall into three categories: (1) the outstanding balance of unpaid rent due at the time of termination under Section 23.1(b)–(c); (2) lost Operating Expenses Rent; and (3) actual out-of-pocket and consequential costs.[165]   Green argues it is entitled to nearly $3 million including a 12 percent prejudgment interest rate, with the principal damages (before interest) calculated by Lochabay at approximately $2.68 million.[166]

MCDS argues Green's actual recoverable damages — after offsets of $2.2 million — cannot be higher than about $396,013, even if all of Green's other claims were accepted.[167]  Green disputes ever waiving any offsets, though MCDS contends only three of eight identified offsets were contested by Green, leaving five as waived.[168]

---

[165] Green Opening at 55.

[166] Tr. 2/5 30:15–31:20; Green Opening at 56–57.

[167]  Post Tr. 51:17–52:1, 52:4–17, 53:18–54:11.   Lochabay calculated total damages of $2,995,921, which includes $2,000,303 in lost rent damages, $499,291 in lost operating expenses rent damages, and $456,327 in out-of-pocket costs.  Feb. 5 Tr. 31:14–20; Green Opening at 56–57.

[168] Post Tr. 125:12–21.

### 1.     *Contractual Damages Under Colorado Law*

Colorado courts treat a "landlord's claim against a tenant for breach of a commercial lease like a breach of contract claim that requires nothing more than application of established principles of contract law."[169]   The proper measure of damages in such an action is "the amount it takes to place the landlord in the position it would have occupied had the breach not occurred, taking into account the landlords duty to mitigate."[170]

A plaintiff is required to prove damages "with reasonable certainty by a preponderance of evidence."[171]   "It is sufficient if the plaintiff establishes by a preponderance of the evidence that he has in fact suffered damage or that his rights have been infringed and that his evidence in this regard provides a reasonable basis

---

[169] *Tremitek, LLC v. Resilience Code, LLC*, 535 P.3d 1005, 1010 (Colo. App. 2023) (cleaned up). In Colorado, a "court's primary obligation is to effectuate the intent of the contracting parties according to the plain language and meaning of the contract.  A trial court takes evidence regarding the intent and meaning of a contract only in the event of a material term's ambiguity, whereas '[w]ritten contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language.'" *Albright v. McDermond*, 14 P.3d 318, 322 (Colo. 2000) (citation omitted).  "In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used, and reference must be made to all the agreement's provisions." *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990).  Colorado courts aim to "not allow a hyper-technical reading of the language in a contract to defeat the intentions of the parties." *Ad Two, Inc. v. City & Cty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 377 (Colo. 2000).  Rather, Colorado courts "adopt a construction of the agreement that will give effect to all of its provisions." *Union Rural Elec. Ass'n, Inc. v. Pub. Util. Comm'n*, 661 P.2d 247, 252 (Colo. 1983).

[170] *Tremitek*, 535 P.3d at 1010.

[171] *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993) (citations omitted) (emphasis removed).

for a computation of the damage so sustained. Difficulty in proof of damages does not in and of itself destroy the right of recovery."[172] Pursuant to Colorado law, a "nonbreaching party is entitled to recover prejudgment interest from the time of the breach."[173]

> Colorado landowners have a duty to mitigate, meaning

> a landlord must not sit by idly and suffer avoidable economic loss. Nor must an aggrieved party mitigate damages 'by giving up its rights under the contract. Rather, a landlord fulfills its duty to mitigate if it makes reasonable efforts to reduce the damages sustained. Ordinarily, this means the landlord must exercise reasonable efforts to procure a substitute tenant—including by taking "some affirmative steps to do so."[174]

"The tenant bears the burden of proving the landlord failed to mitigate damages."[175]

> 2.      *Green Is Entitled to Lost Rent Damages, Minus Certain Offsets.*

Green claims $2,000,303 in lost rent damages, including (1) "rate variance" lost rent of $890,479, the difference between the lease rent and the fair market value rent appraised by Bill James; and (2) actual lost rent of $1,554,993 for the period without a full replacement tenant.[176]

The primary dispute centers on the methodology for calculating lost rent pursuant to Section 23.1(b) of the Lease, which specifies "the present value of the

---

[172] *Riggs v. McMurtry*, 400 P.2d 916, 919 (Colo. 1965) (citations omitted).
[173] *Butler v. Lembeck*, 182 P.3d 1185, 1194 (Colo. App. 2007) (citation omitted).
[174] *Tremitek, LLC*, 535 P.3d at 1010 (cleaned up).
[175] *Id.*
[176] Green Opening at 57–59, 61–62.

balance of the Rent for the remainder of the Term after termination less the present value of the fair market value rental of the Premises for said period (both determined by applying a discount rate of the Wall Street Journal Prime Rate)[.]" Put simply, Section 23.1(b) involves subtracting the present market value from the remaining lease rent.[177]

### a.  Green Properly Calculates Rate Variance Lost Rent.

For the rate variance calculation, Lochabay (Green's expert) utilized the calculation in Lease paragraph 23.1(b) and calculated the "rent that was contemplated in the MCDS lease;" Lochabay then "scheduled that out throughout the entire term of the [L]ease, and then . . . discounted that value back to the date of trial."[178]  For the first part of this calculation, Lochabay used $12.50—the rent contemplated in the MCDS lease.[179]  For the second part of the 23.1(b) calculation, Lochabay utilized a fair market value rental rate calculated by Bill James (Green's

---

[177] Landlord is entitled to recover from Tenant. JX1 at MCDS001030.
[178] Tr. 2/5 11:11–15.
[179] Tr. 2/5 11:16–19.

other expert)—$9.52 per square foot."[180]   In total, Lochabay opined that rate variance lost rent totaled $890,479.[181]

MCDS disputes Green's methodology for calculating damages, asserting Section 23.1(b) specifies a narrow formula for lost rent damages, which Green ignored.[182]   As to the first part of the calculation, MCDS contends that although Green used $12.50 per square foot as the base rent, Green failed to account for rent abatement.[183]   MCDS also challenges the Lochabay's use of James's comparables analysis, advocating for a market approach.[184]

MCDS further contends Green has not proven the comparability of properties, particularly regarding locations and lease terms.[185]   According to MCDS, James's appraisal methodology is flawed as it relies on properties that are not truly comparable to the Premises.[186]   MCDS argues the most reliable comparables should be from the same location, park, or developer, as these factors are crucial in

---

[180] Tr. 2/5 34:20–35:2.  James, a licensed and certified real estate appraiser prepared an appraisal report of the Premises both with and without tenant improvements.  Feb. 4 Tr. 222:2–11, 224:6–8, 225:2–6.  After inspecting the Property, performing market research and analyzing rental rates of comparable properties, James identified "potential rental transactions that would be sufficiently reliable and sufficiently comparable to provide an adequate indicator of the market rent of the [Premises]."  Tr. 2/4 228:11–229:2.  James used eight properties in the vicinity of the Denver Airport, called the "aerotropolis," upon which he based his market rent appraisal.  Tr. 2/4 228:6–10, 233:14–18.

[181] Tr. 2/5 13:9–14.

[182] Post Tr. 55:14–56:14.

[183] MCDS Reply at 29.

[184] *Id.* at 29–31.

[185] Post Tr. 57:23–58:12, 63:3–64:1; 62:19–64:6.

[186] MCDS Reply at 31–35.

determining the value of a property.[187]  MCDS highlights that Green's appraisal included only one property from the same location, while the others were up to 14 miles away, undermining the reliability of the valuation.[188]

MCDS also argues Green's appraisal failed to consider other leases within the same park that were available and more comparable.[189]  MCDS points out that Green's expert, James, did not personally select the comparables and was unaware of other leases in the same location, which were crucial for a reliable appraisal.[190] MCDS asserts that including these more relevant comparables would have resulted in a fair market value of $12.97 per square foot, which aligns with the negotiated rent in the Lease, thereby resulting in no damages under Section 23.1(b).[191]

Finally, MCDS challenges Landlord's use of $9.52 per square foot as the fair market value.[192]  MCDS claims the appraisal provided two estimates, with and without tenant improvements, but neither was substantiated as the better estimate for damages calculation.[193]  MCDS argues the lease contemplated extensive tenant improvements, which should have been factored into the fair market value, and that Lochabay failed to account for these improvements in their valuation.[194]  MCDS

---

[187] *Id.* at 32.
[188] *Id.* at 33.
[189] *Id.*
[190] *Id.*
[191] *Id.* at 35.
[192] *Id.* at 35–40.
[193] *Id.* at 36.
[194] *Id.* at 36–37.

insists because the contract rent equals the fair market value, as shown by the arm's-length transaction, the formula results in "zero," meaning no loss to Green and no recoverable damages.[195]

The Court finds Green's reading of Section 23.1(b) to be the correct one. For the first part of the Section 23.1(b) analysis, the use of $12.50/square foot is proper, as no abatement is necessary given MCDS's repudiation.[196]

As to the second part of the Section 23.1(b) analysis, the Court agrees with Green that the fair market value rental rate of $9.52/square foot, as calculated by James, is correct. James is a licensed and certified Denver real estate appraiser who has been appraising the Denver market since 1976.[197] Although Farrell (MCDS's rebuttal expert) criticizes James's comparables for not using locations closer to the Premises, the Court credits James, who actually has experience in the Denver market, over Farrell, a Chicago resident who is not an appraiser and has no experience evaluating properties in Denver.[198] The Court also finds that it would not

---

[195] Post Tr. 56:8–14, 58:4–59:9.

[196] *See* JX 1 at MCDS001018–MCDS001019, MCDS001029. The repudiation properly falls within the category of "Abandonment/Vacation" pursuant to Section 22.1 and is therefore an "Event of Default" as defined by Section 22. Although MCDS claims Green waived the right to challenge this, the Court disagrees. Green addressed the abatement issue in its post-trial Answering Brief. Green Reply at 30 n.5.

[197] Tr. 2/4 222:2–11, 224:6–10, 225:2–8.

[198] Tr. 2/5 98:8–14, 104:22–105:2. As James credibly testified, his comparables are within "the vicinity of Denver International Airport," called the "aerotropolis," and included locations a hypothetical tenant would consider rather than only looking at the subject property. Tr. 2/4 236:6–12. For similar reasons, the Court finds that James' review and subsequent approval of, rather than personally selecting, comparables was an acceptable practice for his methodology.

be appropriate to use leases from the same location as the Premises, as the definition of Fair Market Rental value explicitly states that the comparables should be "comparable in size and use to, *and in the general vicinity of*, the Building," *not* the Building itself.[199]

By contrast, MCDS's reading of the Lease that would result in Green receiving $0 in damages would render Section 23.1(b) superfluous.[200] The presence of Section 23.1(b) reveals the economic reality that, under the Lease, MCDS was going to pay a higher rate than fair market value.[201] MCDS's reading is also contrary to the definition of Fair Market Rental Value in the Lease: "For all purposes hereof, the 'Fair Market Rental Value' of the Premises will be the rental rate based upon the then prevailing rent for premises comparable in size and use to the Premises. . . ."[202] The "prevailing rent for premises comparable" thus excludes, by definition, the Premises and instead requires a comparables analysis.[203] This definition also

---

[199] JX 1 at MCDS001056 (emphasis added).

[200] The Supreme Court of Colorado rejected the practice of interpreting contracts in ways that render contractual provisions superfluous. *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 700 ("We choose a construction of the contract that harmonizes provisions instead of rendering them superfluous.")

[201] MCDS's position is essentially that the agreed upon rent under the Lease is synonymous with fair market value rent. Post. Tr. 56:8–14. MCDS therefore suggests it is impossible to pay a higher rate than fair market value. Such a position is unsupported by the language of the Lease, which clearly differentiates agreed upon Rent from fair market value rent. JX 1 at MCDS001030.

[202] JX 1 at MCDS001056.

[203] This reading also synthesizes with Colorado law, which states when performing a fair market value analysis, the subject property should be excluded. *See Matthews v. Jefferson Cnty. Bd. of Equalization*, 2024 WL 3978449, at *2 (Colo. App. May 16, 2024), *cert. denied*, 2024 WL 4611594 (Colo. Oct. 28, 2024) ("[T]he market approach involves analyzing sales of comparable properties in the market.") (citation omitted); *Home Fed. Sav. Bank v. Larimer Cnty. Bd. of*

supports James's (and subsequently Lochabay's) decision to use the appraised value without tenant improvements, as that is the way the Premises are defined in the Lease.[204] Any other reading of Section 23.1(b) would always result in a zero dollar damages calculation, which does not comport with Colorado law regarding damages.[205]

Lochabay calculated lost rent at $890,479.[206] This number, however, improperly includes the 12 percent simple interest rate included in Section 23.1(a) of the Lease, which both parties agree is inapplicable here.[207] The Court orders the Parties to jointly determine the amount of lost rent once interest is removed. The Parties are then to submit this revised number to the Court for final approval of damages.[208]

---

*Equalization*, 857 P.2d 562, 563–64 (Colo. App. 1993) (holding it is appropriate to "consider[] what other properties comparable to the subject actual sold for in the market place at or about the date for which a value is sought for the subject property").

[204] JX 1 MCDS001014.

[205] *See Tremitek*, 535 P.3d at 1010 (the proper measure of damages under a lease is "the amount it takes to place the landlord in the position it would have occupied had the breach not occurred"); *Schneiker*, 732 P.2d at 612 ("Usually this will be the difference between the rent reserved in the lease and the reasonable rental value of the premises for the duration of the term of the lease, plus any other consequential damages caused by the breach.").

[206] Tr. 2/5 13:9–14.

[207] Green Opening at 37; MCDS Reply at 28.

[208] The Court notes that a successful plaintiff is entitled to prejudgment interest on money damages as a matter of right, computed from the date liability accrues. *See Fortis Advisors, LLC v. Dematic Corp.*, 2023 WL 2967781, at *1 (Del. Super. Apr. 13, 2023) (citing *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011). Plaintiff is also entitled to post-judgment interest. *NGL Energy P'rs LP v. LCT Cap.*, 319 A.3d 335, 343 (Del. 2024). Thus, when the parties submit their form of order, they should also calculate the appropriate amount of interest.

b.    Green Is Entitled to Actual Lost Rent.

For the actual lost rent, Lochabay calculated the period of lost rent under the Lease from March 1, 2023 to the date that a hypothetical new tenant would begin paying rent.[209]  "To be conservative in his overall loss opinions, Lochabay assumed that a hypothetical full-time replacement tenant would sign a lease on the date of trial."[210]  Lochabay opined that Green's total actual lost rent amounted to $1,554,993.[211]

Green contends Section 23.1(c) acts as a catch-all provision, arguing it is broad enough to capture lost rent and any other consequences needed to "make the landlord whole," including consequential damages and all losses proximately caused by default.[212]

Section 23.1(c)'s language is broad:

> any consequential damages or other amount necessary to fully compensate Landlord for all loss or injury proximately caused by Tenant's default or which in the ordinary course of business would be likely to result therefrom, including, without limitation, the unamortized portions of the Tenant Allowance and leasing commissions paid by Landlord in connection with this Lease, amortized on a straight-line basis over the Term of the Lease, the cost of recovering the Premises from Tenant, the cost of removing and storing Tenant's furniture, trade fixtures, equipment, inventory or other property, repairing and/or demolishing the

---

[209] Tr. 2/5 15:14–21.  This calculation "represented the period of time where Green doesn't have a full replacement tenant in the space."  Tr. 2/5 13:22–14:12.
[210] Green Opening at 61–62 (citing Tr. 2/5 at 18:7–9).
[211] Tr. 2/5 19:13–18.
[212] Post Tr. 111:16–112:14, 115:15–20.

35

Premises, removing and/or replacing Tenant's signage and other fixtures, excluding the following: the costs of making the Premises ready for a new tenant, the costs of any leasehold improvements, and any allowances and/or concessions provided by Landlord to any such new tenant.[213]

Green argues the Lease allows for damages to make the landlord whole, including lost rent.[214] Lochabay, in his lost rent analysis, calculated the period of lost rent under the Lease from the deemed commencement date of March 1, 2023 to the date a hypothetical new tenant would begin paying rent.[215] "To be conservative" with his opinion, Lochabay assumed that a hypothetical full time replacement tenant would sign a lease on the first day of trial in February 2025.[216] The hypothetical new tenant would begin paying full rent in June 2026 because of the need for a build out and the typical rent abatement Green offers.[217]

MCDS argues the Lease does not support recovering rent-based damages pursuant to Section 23.1(c).[218] MCDS contends Green's calculation of lost rent damages is flawed due to the use of a hypothetical tenant and failure to account for necessary offsets.[219] MCDS argues that pursuant to the canons of contract interpretation, Sections 23.1(a) and (b) already cover all backward and forward-

---

[213] JX 1 at MCDS001030.
[214] Post Tr. 111:16–112:14.
[215] Tr. 2/5 15:14–19.
[216] Tr. 2/5 18:7–9.
[217] Green Opening at 61–62 (citing Tr. 2/5 15:22–16:21).
[218] Tr. 2/5 13:22–14:12; MCDS Reply at 37.
[219] MCDS Reply at 42–43.

looking rent.[220]  By contrast, Section (c) (which omits any reference to rent) was intended to cover only ancillary or consequential losses (*e.g.*, cleanup, removal of signage), with any other reading rendering sections of the contract surplusage.[221] Accordingly, MCDS asserts that Green is not entitled to "lost rent" under Section 23.1(c), and that any claim for out-of-pocket costs must be strictly limited to amounts causally and temporally linked to the breach.[222]

The Court agrees that Section 23.1(c) enables Green to recover for lost rent damages.  The Court also notes that the language from Section 23.1(c), which requires any damages "to fully compensate Landlord for all loss or injury proximately caused by Tenant's default" comports with Colorado law on expectation damages,  where a plaintiff is entitled "recover the amount of damages that are required to place him in the same position he would have occupied had the breach not occurred."[223]  Because Green did not ever sign a lease with a replacement tenant, under an expectation damages theory, Green is entitled to the value of a full cover tenant, less mitigation, as damages pursuant to Section 23.1(c) and Colorado law.

The Court also notes that MCDS improperly reads Section 23.1(c).  MCDS's reading of Section 23.1(c) ignores the connector "or."  While true that Section

---

[220] *Id.* at 38–40.
[221] Post Tr. 68:4–20, 69:8–70:1.
[222] Post Tr. 72:1–9.
[223] *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993) (citations omitted) (emphasis removed).

23.1(c) does not include the term "rent," this is because the list of items included in Section 23.1(c) that follow the term "or"—are those which "in the ordinary course of business would be less likely to result therefrom. . . ." Because the first part of Section 23.1(c) already accounts for damages to fully compensate Landlord (including lost rent), it is unnecessary to include "rent" in the list of items that would result "in the ordinary course of business."

The Court also finds that Lochabay's hypothetical tenant analysis is a reliable measure of damages. MCDS is correct that Lochabay's calculation does not fully consider the mitigation Green experienced through TK Elevators, a cover tenant.[224] This analytical deficiency, however, is minor and remedied through Lochabay's conservative assumptions. Green was only able to rent a small portion of the Premises on a month-to-month basis.[225] Any mitigation stemming from cover tenants under these circumstances would be more than accounted for by Lochabay cutting off damages as of the date of trial.[226]

---

[224] MCDS Reply at 41–42.
[225] Green Reply at 39.
[226] *Id.* at 38–39. As Green notes, both the Parties and the Court now know a full-time replacement tenant did not sign a lease by the date of trial. *Id.* at 39. Lochabay's conservative estimate therefore is a benefit to MCDS, as damages are much larger than even Lochabay's conservative approach anticipated.

The Court further finds that MCDS has failed to meet its burden of proving Green did not mitigate damages.[227] As MCDS points out, Green did in fact mitigate damages by leasing portions of the Premises to cover tenants.[228] While the remaining portions of the Premises remained vacant, it was not for the inadequacy of Green's efforts. Green continued to market the space to potential customers, an adequate mitigation effort recognized under Colorado law.[229]

The Court will now address MCDS's remaining arguments that Green's lost rent damages fail to account for necessary offsets, including (a) the amount Green saved by not having to pay for the Tenant Allowance ($1,232,864); (b) lease commissions ($137,198); Rent abatement ($301,302); (c) prejudgment interest ($105,624); and (d) MCDS's deposit ($127,674).[230] The Court finds on each of these issues as follows:

- The Tenant Allowance should be deducted from Green's damages. By not having to pay for MCDS's buildout, Green is saving $1,232,864.

---

[227] MCDS argued in the post-trial argument that Green waived the right to assert mitigation, but the Court disagrees. Green discussed mitigation in its post-trial Answering Brief. Green Reply at 38–39.

[228] MCDS Reply at 41.

[229] Green Reply at 39; *See CMCB Enter., Inc. v. Ferguson*, 114 P.3d 90, 96 (Colo. App. 2005) (finding a plaintiff adequately attempted to mitigate damages where the plaintiff "contacted existing restaurant owners, advertised the property to the brokerage community that represents other restaurant users, sent out broadcast e-mails, placed ads in the paper, distributed a brochure regarding the premises to potential tenants and restaurant operators, and posted a "for lease" sign for the premises.")

[230] MCDS Reply at 42–43. The Court notes that neither side provides the Court much guidance on these issues.

Under Green's own expectation damages theory, to put Green back in the same position without a breach, including this amount would amount to double recovery.[231]

- The lease commissions are explicitly recoverable under Section 23.1(c) and, as MCDS admits,[232] were expenses Green expected (and did) incur in connection with the Lease;

- The Court has previously discussed how rent abatement is unnecessary given MCDS's repudiation.[233]

- Lochabay improperly uses the 12 percent interest rate from Section 23.1(a) for his 23.1(c) damage award, and this figure should be removed from the damages figure;

- MCDS's security deposit should be deducted from Green's damages award, as Green's own expert Lochabay admits.[234] The $127,674.00 MCDS characterizes as a deposit, however, represents more than MCDS's security deposit.[235] MCDS is only entitled to offset for its security deposit—$63,836.93—not pre-paid rent.

---

[231] The Court notes that while Section 23.1(c) includes the Tenant Allowance as recoverable, this appears to be the case only if MCDS defaulted mid- /post-buildout, instead of pre-buildout. In any event, Green did not dispute this deduction in either its Reply Brief or oral argument.

[232] MCDS Reply at 42.

[233] *See supra* note 200 and accompanying text.

[234] Tr. 2/5 at 141:1–142:4.

[235] As the pretrial stipulation states, the $127,674.00 figure represented MCDS's deposit and first month's rent under the Lease. Pretrial Stip. ¶ 21.

The Court orders the parties to submit a revised number for lost rent, accounting for the offsets described above. The damages figure should not include the 12 percent simple interest rate from Section 23.1(a) of the Lease, which the Court finds was improperly included. The parties shall then submit this revised number to the Court for final approval of damages.

### 3. *Green Is Entitled to Operating Expenses Rent.*

Green claims $499,291 in lost operating expenses rent damages, which MCDS was obligated to pay pursuant to Section 5.2(a) of the Lease. This calculation considers "the primary drivers of Operating Expenses Rent," including "property taxes, property insurance, and repairs and maintenance for common areas."[236] Lochabay calculated his damages figure by utilizing Green's actual Operating Expenses calculation for 2023, Green's estimate of the Operating Expenses for 2024, and Green's estimate of Operating Expenses for January 2025.[237] Lochabay then reduced the Operating Expense Rent calculations by the amounts received by Green from its partial replacement tenant.[238]

MCDS does not dispute Green's figure for Operating Expense Rent. Rather, MCDS's sole argument in response to Operating Expense Rent is that "operating expenses rent" is not recoverable pursuant to Section 23.1(c). For the same reasons

---

[236] Green Opening at 63.
[237] JX 209 at GREEN013973; Tr. 2/5 22:5–23.22.
[238] Tr. 2/5 23:23–24:3.

Green is entitled to lost rent to put it back in the same position if MCDS did not repudiate, Operating Expenses Rent is recoverable by Green.

Lochabay's calculation for Green Operating Expenses Rent, like lost rent, similarly includes the 12 percent simple interest rate included in Section 23.1(a) of the Lease. The Court orders the Parties to jointly determine what Lochabay's calculation for Operating Expenses Rent should be once interest is removed. The Parties are then to submit this revised number to the Court for final approval of damages.

### 4. *Green Is Not Entitled to Out-of-Pocket Damages.*

Green seeks $456,327 for out-of-pocket expenses incurred due to MCDS's breach under Section 23.1(c).[239] These expenses are supported by invoices and proof of payment, covering costs from vendors like Major Heating & Air Conditioning and Cushman & Wakefield. MCDS argues Green has not demonstrated any of the out-of-pocket costs meet the definition of consequential damages or "other amounts necessary to fully compensate [Green] for all loss or injury proximately caused by [MCDS]'s default of which in the ordinary course of business would likely to result therefrom" pursuant to Section 23.1(c).[240] The Court agrees with MCDS.

---

[239] Green Opening at 64–65.
[240] MCDS Reply at 43–44 (citing JX 1 at MCDS001030).

Each of the "out-of-pocket" damages claimed by Green incurred because of the negotiation process with MCDS. Because each of these damages predate the breach, the damages are not within the scope of Section 23.1(c). In this instance, Green is conflating theories of damages. Green's attempt to recover "out-of-pocket" damages does not comport with expectation damages pursuant to Colorado law, which "place the landlord in the position it would have occupied had the breach not occurred."[241] Rather, "out-of-pocket" damages are backward looking, rescissory damages that put the injured party back in the position they occupied prior to entering the contract.[242] Green is therefore not entitled to "out-of-pocket" damages.

5.     *Green Is Entitled to Attorneys' Fees as the Prevailing Party.*

The parties agree that Section 27 of the Lease provides that the prevailing party in this action is entitled to attorneys' fees:[243]

> In the event there is any legal action or proceeding between Landlord and Tenant to enforce any provision of this Lease or to protect or establish any right or remedy of either Landlord or Tenant hereunder, the prevailing party (as such issue is determined by the fact finder in such legal action or proceeding) to such action or proceeding will be entitled to recover all costs and expenses, including reasonable attorneys' fees (including allocated costs of Landlord's in-house attorney), incurred by such prevailing party in such action or proceeding and in any appearance in connection therewith. If such prevailing party recovers a judgment in any such action, proceeding or

---

[241] *Tremitek*, 535 P.3d at 1010. (citation omitted).
[242] *See Rice v. Hilty*, 559 P.2d 725, 727 (Colo. App. 1976) ("In suits involving rescission, the parties must be placed in the status quo.").
[243] Green Opening at 65; MCDS Opening at 45. *See also Klein v. Tiberon Dev. LLC*, 405 P.3d 470, 475 (Colo. App. 2017) ("Contractual fee-shifting provisions are generally valued under Colorado law.") (cleaned up).

appeal, such costs, expenses and attorneys' fees will be determined by the court handling the proceeding and will be included in and as a part of such judgment.

Here, Green is the prevailing party in terms of both liability and damages. Although Green did not recover all the fees it believed it was entitled to, nothing in the Lease prevents Green from being the prevailing party. Green is entitled to its costs, expenses, and attorneys' fees. Green shall submit an affidavit to the Court regarding its costs, expenses, and attorneys' fees within fourteen days.

## CONCLUSION

The Court finds as follows:

1.  MCDS repudiated the Lease, thereby breaching its contractual obligations;

2.  Green's noncooperation claim is moot;

3.  Green is entitled to damages for the plaintiff's breach by repudiation, less any improperly applied 23.1(a) interest, as described herein, plus pre- and post- judgment interest;

4.  Attorneys' fees, costs, and expenses shall be shifted to MCDS. Green shall provide an affidavit regarding its attorneys' fees, costs, and expenses to the Court within fourteen days; and

5.  Judgment is entered in Green's favor.

If there are any open issues not addressed or mooted by this post-trial opinion, the parties shall notify the Court by letter within five days.  Otherwise, after Green submits its affidavit on attorneys' fees, the parties are directly to jointly prepare a final order to the Court for its approval.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

45